KRISTIN HARDING, Plaintiff-Appellant, v. THE CITY OF HIGHLAND PARK, Defendant-Appellee.

Second District   No. 2—91—0650

Opinion filed May 4, 1992.

Steven P. Schneck, of Hartunian, Futterman & Howard, Chartered, of Chicago (Aram A. Hartunian, of counsel), for appellant.

DeSanto & Bonamarte, P.C., of Highland Park (Michael F. Bonamarte III, of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

On June 8, 1987, plaintiff, Kristin Harding, brought suit against defendant, the City of Highland Park (City), for damages alleged to have been caused by plaintiff's fall into a water meter pit owned and maintained by defendant. The jury found for the plaintiff and awarded her damages in the amount of $76,310.70. The trial court entered judgment notwithstanding the verdict for the defendant, based on its conclusions that proof of actual or constructive notice of the

dangerous condition was required by statute, separate from proof that the dangerous condition was directly caused by the City in the first place. In a supplemental order, the trial court granted defendant's motion for a new trial and entered a remittitur of $40,000.

On appeal, plaintiff raises the following issues: (1) whether the statute requires proof that defendant had notice of a dangerous condition, separate from proof that the City negligently caused the dangerous condition in the first place; (2) whether the jury's verdict was against the manifest weight of the evidence; (3) whether a remittitur of $40,000 was justified in this case; and (4) whether the testimony of the plaintiff's doctor concerning disability should have been excluded from the evidence. Because of our rulings on the first three issues, we need not address plaintiff's fourth contention.

Initially, we note our confusion regarding the trial court's orders in the appeal at bar. In our view, the court's entering a judgment notwithstanding the verdict should have concluded the case. The need for the granting of a new trial and entering a remittitur of $40,000 seems unnecessary in light of the judgment *n.o.v.* Having so stated, we will describe the relevant facts without further comment.

Also, we will note that plaintiff's complaint filed June 8, 1987, averred *inter alia* that defendant had actual or constructive notice of the dangerous condition which caused plaintiff's injury. At trial immediately prior to closing arguments, the court below granted plaintiff leave to file an amended complaint which averred that defendant's agents failed to secure properly the water meter pit lid after checking the water meter and, thereby, created the subject unsafe condition.

At the trial held in August 1990, John Shelton, a public works foreman for defendant, testified as an adverse witness in plaintiff's case. He stated that defendant maintained a water meter in the parkway in front of the Harding residence at 1244 Taylor Avenue, Highland Park. The water meter is situated in a pit which was five to six feet deep. Atop the pit is a circular cover made of cast iron. It measures 16 inches in diameter and is approximately five-sixteenths to three-quarters of an inch thick. The cover weighs four to five pounds. The removal of same requires a person to fit a screwdriver into the space between the lid and frame and then pry upwards and, finally, to pull the cover back. Defendant's water meter covers are intended to be walked on by pedestrians. The plaintiff could fall into the meter pit only if the cover is removed and then put back without being correctly reseated in the groove. The improper placement of the cover cannot be caused merely by weather or by someone walking across the water meter. Defendant's water department reads about 200 wa-

ter meters per day. To prevent hazard to foot traffic, it is very important to replace a water meter cover carefully and to clean it of dirt.

Mr. Shelton further stated that water bills are based either on actual readings or estimates. The bill for the winter quarter is usually estimated, based on the arithmetic average of the three prior bills. However, a meter will actually be read (and reread) during winter if a resident complains about the amount. Rereadings and special readings are common.

Plaintiff testified that her injury occurred on January 22, 1987. At about 12 p.m., she was driven to her home, 1244 Taylor Avenue, by a friend from work. Plaintiff then borrowed her brother's truck and visited her grandmother in Highwood. Upon returning, she parked the truck on the street in front of her home. She got out of the truck and walked towards the front of the house. There was a covering of snow on the ground. The sun was shining, and the temperature was below freezing.

Plaintiff stepped on the water meter cover in the parkway. It gave way, and plaintiff's right leg fell into the pit's opening up to her groin. Her right knee and pelvic area came into contact with the pit's rim. Her left leg was twisted behind her. In a great deal of pain, plaintiff was unable to extricate herself from this position and called for help. Family members eventually came to her aid, but they decided to call paramedics to remove her from the meter pit. Paramedics lifted her from the opening and took her to the Highland Park Hospital.

Thereafter, plaintiff received medical treatment but was unable to continue with her normal activities. Plaintiff no longer went bowling, jogging, walking or dancing, activities in which she had regularly engaged. Plaintiff could not walk up or down stairs, so she had to sleep on the first floor and be carried on stairways. For some months following the accident, plaintiff experienced constant pain in her right knee and right pelvis.

Plaintiff was primarily treated by Dr. Norman Cohen, a board-certified orthopedic surgeon. He first examined her on January 28, 1987. This initial examination revealed substantial pain with flexion of the right hip. Dr. Cohen noted bruises on the front of the right knee, as well as limitation of right knee flexion to 25 degrees. He diagnosed "[m]ultiple severe contusions or contusions of soft tissue injuries." Dr. Cohen immobilized plaintiff's right knee and prescribed crutches. Under Dr. Cohen's care, plaintiff received heat therapy and performed exercises that included leg bends and leg lifts. These measures did not relieve her pain or allow her to resume normal activity. Due to plain-

tiff's minimal improvement with conservative treatment, Dr. Cohen performed a right knee arthrogram which revealed a popliteal cyst, *i.e.*, a collection of joint fluid behind the knee. Otherwise, the arthrogram was interpreted as normal. Dr. Cohen opined that the popliteal cyst resulted from the trauma plaintiff sustained in January 1987.

Plaintiff underwent arthroscopic surgery on July 21, 1987. Dr. Cohen's diagnosis of her condition was medial shelf plica syndrome and fiber arthrosis of the knee joint. In his opinion, these conditions were related to plaintiff's fall into the meter pit. He further opined that her symptoms were probably permanent.

Dr. Cohen examined plaintiff the day after this surgical procedure. He did not examine plaintiff again until April 23, 1990, at which time plaintiff complained of pain in her right knee that was exacerbated by weather changes and climbing or descending stairs. Plaintiff also described a sensation of weakness in her right knee. As to objective findings, Dr. Cohen observed some softening, degeneration and inflammation of the right kneecap's surface. Because plaintiff remained symptomatic since her fall into the meter pit, Dr. Cohen believed her condition was related to the subject injury. He also opined that plaintiff's knee condition was "[m]ore probably than not" permanent.

Following her arthroscopic surgery in July 1987, plaintiff's condition improved to the point she could walk short distances without pain. She followed an exercise regimen prescribed by Dr. Cohen of a 15-minute workout three or four times a week. Nevertheless, she was not able to resume physical activities, such as aerobics or long-distance walking, which she previously had enjoyed. Standing for long periods of time caused pain in her right knee. Also, weather changes caused her right knee to tighten, resulting in a throbbing pain. This happened on at least a weekly basis.

Harriett Harding, plaintiff's mother, testified that sometime in November 1986 she telephoned defendant to complain about her high water bill. She got the number from the telephone book. The first person who answered Mrs. Harding's call was identified as the defendant, and the call was then transferred to the water department. The next voice was identified as the water department. The water department employee promised to send someone out to read the Hardings' meter. Three or four days later, Mrs. Harding called defendant's water department again and was told that the water meter had been checked and that it was functioning properly. The water department employee suggested that there might be a leak in her house. Sometime after Christmas 1986, perhaps early in January 1987, Mrs.

Harding saw a white vehicle with defendant's logo on it parked in front of her house. Two men dressed in winter coats were standing around the opening of the water meter lid, which had been removed. The men were looking into the pit. She saw them as she walked past the dining room window.

Mrs. Harding received a water bill dated January 6, 1987. Said bill indicated it was based on a regular reading rather than an "estimated" one. The balance due on said bill was $20.34, which was substantially lower than the previous two bills of approximately $43 and $67.

Plaintiff's brothers, Jeff and Joe Harding, and Mark Tazioli, Jeff's friend, all of whom were at the subject residence when the accident occurred, came to the plaintiff's aid after her fall into the water meter. Each saw that plaintiff's right leg was fully down into the pit, and her left leg was twisted behind her.

Gary Grove, testifying as an adverse witness, stated that he had worked for defendant primarily as a water meter reader for approximately 13 years. He read approximately 200 meters a day and was responsible for reading the water meter at the subject residence. Based upon his records, Mr. Grove thought the last time he had checked the subject meter prior to plaintiff's accident was September 1986. It was his practice to make sure the pit's cover was secure after making a reading.

At the close of plaintiff's case in chief, defendant made a motion for a directed verdict, arguing that defendant had to have actual or constructive notice of the subject dangerous condition for liability to attach. In denying this motion, the court below stated:

"I am going to deny the motion for directed verdict because I think this—and I could well be wrong about it, but I don't think so. 3—102 of Chapter 85 I don't think is intended to govern this situation where indeed notice, actual or constructive, is simply not an issue. If the inference drawn from the circumstantial evidence is that the employees of Highland Park did something directly negligent—and I understand the City's position on that, that I am absolutely dead wrong—then I have to follow 3—102. But it doesn't make any sense to talk about actual and constructive notice when you are talking about performing a negligent act.

There is no concept of law that ever says that when you are guilty of direct negligence, that you have to have actual or constructive notice of the negligence before you can be held liable. I don't think that that is what this tort immunity law is in-

tended to say. So that is why I am denying the directed verdict because one of the inferences that could be drawn from the circumstantial evidence in this case is that it is the employees of Highland Park that did it."

Defense witness Dr. Michael Gonzalez, board certified in physical medicine and rehabilitation, examined plaintiff on June 8, 1989, at defendant's request. He performed a variety of tests designed to analyze the condition of plaintiff's right knee, which he determined was normal in all important aspects. Dr. Gonzales opined that plaintiff did not sustain any permanent injury or disability as a result of her January 22, 1987, accident. He also opined that plaintiff had no permanent abnormality of her knee which should cause pain. On cross-examination, he admitted that plaintiff did experience pain during one of the maneuvers he performed upon her. Dr. Gonzalez further conceded that he had never performed arthroscopic surgery.

Jorene Ugasti, an employee of defendant, testified that early in 1987, she was being trained in water billing. She filled in for the regular billing clerk who was vacationing. She prepared the winter water billing for section one of Highland Park, which included the Harding residence. She erroneously caused the bills to be printed based on "regular" readings rather than on "estimated" ones. The original card on which the subject water meter's reading was recorded had been lost. Ms. Ugasti stated that all the originals of defendant's meter reading cards had been misplaced. The photocopy of the subject card indicated no special reading of the Harding water meter late in 1986 or early in 1987.

Gary Grove also testified for the defendant. He was familiar with the subject residence in his job as a meter reader for defendant. Mr. Grove stated that he had not read the subject water meter between September 1986 and March 1987.

As noted above, the jury returned a verdict of $76,310.70. Of that total, $40,000 was for plaintiff's disability, $30,000 for past and future pain and suffering and $6,310.70 for medical costs.

Defendant's post-trial motion moved the court *inter alia* to enter a judgment notwithstanding the verdict or, in the alternative, grant a new trial.

In its memorandum order entered on March 27, 1991, the trial court granted defendant's post-trial motion for judgment notwithstanding the verdict based upon its conclusion that defendant had no actual or constructive notice of the subject dangerous condition. Citing *Bellino v. Village of Lake in the Hills* (1988), 166 Ill. App. 3d 702, and *Palermo v. City of Chicago Heights* (1971), 2 Ill. App. 3d 1004,

the trial court held that defendant's motion for directed verdict at the close of plaintiff's cause should have been granted. It also held that plaintiff's motion to file an amended complaint should have been denied at trial.

In a supplemental order entered May 17, 1991, the trial court ruled *inter alia*: (1) that the jury's verdict was against the manifest weight of the evidence; and (2) that the jury's verdict assessing damages against defendant in the amount of $76,310.10 was against the manifest weight of the evidence. Then, the trial court granted defendant's motion for a remittitur in the amount of $40,000. Further, it conditionally entered defendant's motion for a new trial. Plaintiff filed this timely appeal.

We first address plaintiff's argument that the trial court erred in granting defendant's motion for judgment notwithstanding the verdict based upon its finding that the Local Governmental and Governmental Employees Tort Immunity Act (Act) (Ill. Rev. Stat. 1985, ch. 85, par. 1—101 *et seq.*) required proof that defendant had actual or constructive notice of a dangerous condition subsequent to the time defendant's employees read the meter.

The Act, which governs a municipal corporation's liability, reads in pertinent part:

> "Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in sufficient time prior to an injury to have taken measures to remedy or protect against such condition." (Ill. Rev. Stat. 1985, ch. 85, par. 3—102(a).)

Based on its interpretation of the Act, the trial court concluded that plaintiff's failure to allege and prove that defendant had actual or constructive notice of the condition which caused her injury was fatally defective to plaintiff's case.

Plaintiff argues that the notice issue is irrelevant because notice is not at issue where the municipality has performed the negligent act. Plaintiff cites *Dziewatkowski v. City of Chicago* (1969), 109 Ill. App. 2d 405, in support of her contention. In *Dziewatkowski*, plaintiff was injured after falling on a mud-coated sidewalk which was adjacent to a site where city workers had dug a parkway to install a new lighting

system. Plaintiff argued that the mud on the sidewalk had resulted from the city's excavation of the parkway. The *Dziewatkowski* court stated:

> "[T]he evidence that the City had caused the work to be done on the parkway was unchallenged. Therefore, the defendant City had notice of the condition in which the work was left, and a municipal corporation which causes work to be done which could be dangerous to the public is bound to take notice of the condition in which it is left, whether safe or dangerous. Cited in support is City of Chicago v. Johnson, 53 Ill 91 (1869), where the court affirmed a judgment for a plaintiff when he fell into a ditch. There the court said no notice was necessary to the City authorities 'as they caused the ditch to be made.' " 109 Ill. App. 2d at 415.

The *Dziewatkowski* court concluded:

> "We find that the City, having caused the work to be done on the parkway prior to the occurrence, had notice of the parkway's condition and its proximity to the sidewalk." 109 Ill. App. 2d at 416.

Defendant maintains that for the City to be liable, plaintiff had to prove actual or constructive notice of the water meter's lid being ajar. For support, it primarily relies on *Bellino v. Village of Lake in the Hills* (1988), 166 Ill. App. 3d 702, and *Palermo v. City of Chicago Heights* (1971), 2 Ill. App. 3d 1004.

In *Bellino*, this court affirmed the trial court's dismissal of plaintiff's complaint pursuant to sections 3—102 and 3—105 of the Act. Plaintiff alleged that the City had negligently plowed and mounded snow at an intersection in such a way as to obstruct his view of cross traffic, creating an unreasonably dangerous condition. The *Bellino* court found the case before it analogous to *Riccitelli v. Sternfeld* (1953), 1 Ill. 2d 133, wherein plaintiff fell on ice which resulted from defendant's snow-clearing efforts. Citing *Riccitelli*, the *Bellino* court noted that liability for damage must be based on the distinction whether the snow causing the injury resulted from a natural or an unnatural or artificial cause.

In conclusion, the *Bellino* court stated:

> "In the present case, the village's motion to dismiss is based on the ground that the Act provides tort immunity for injuries resulting from the 'effects of the weather.' *** In our opinion, the trial court properly found that section 3—105 preempts municipal liability where an alleged injury arises from the 'effects of weather.' " 166 Ill. App. 3d at 709.

In *Palermo v. City of Chicago Heights* (1971), 2 Ill. App. 3d 1004, plaintiff, after visiting a friend, walked across a parkway where she stepped on a water meter pit cover. The cover tilted and flipped over, causing plaintiff's right leg to go into the hole up to her buttocks. Plaintiff's friend testified that she observed that the cover was not fully within its placement four weeks prior to the incident. The friend's husband had complained to defendant's water department six weeks prior to the accident; he had told the friend that "someone" came out to fix the cover. The friend did not notice what had been done to repair the cover, but two weeks before the subject accident she noted that the cover was still in disrepair. Defendant's city commissioner of waterworks denied that his department had ever been contacted about the faulty cover. Defendant denied it had actual nor constructive notice. Due to the inadequacy of plaintiff's case, the *Palermo* court found that defendant had neither actual nor constructive notice of the dangerous condition.

Plaintiff argues that neither case stands for the proposition that if a municipality, through its negligent actions causes a dangerous condition, the Act protects it from liability. We agree. *Bellino* does not squarely address the issue of whether the relevant statutes require actual or constructive notice to a municipality when it was alleged to have negligently caused a dangerous condition. Nor does *Palermo* address this issue. Rather, it deals with the question of whether the City received actual or constructive notice of the dangerous condition.

Although *Dziewatkowski*, upon which plaintiff relies so heavily, is factually distinct from the instant case, it does deal with a municipality's negligent creation of a dangerous condition. As such, it provides support for our conclusion that section 3—102 of the Act does not preclude a municipality's liability in cases where it has negligently caused the dangerous condition.

Several Federal jurisdictions have determined that when the municipality is responsible for the dangerous condition it does not enjoy immunity from liability. See, *e.g., Bieber v. City of Newcastle* (D. Wyo. 1965), 242 F. Supp. 457, 458 ("where the defects or causes of injuries *are not traceable to a positive act of the municipality* or of those for whose conduct it is liable, but are due to its failure to inspect and ascertain the existence of defects not caused by its active negligence, then it must have notice, actual or constructive, of the defects, and must have had a reasonable time and opportunity to remove the defects") (emphasis added); *McDermot v. City of New York* (2d Cir. 1961), 287 F.2d 49, 50 ("[a] municipality is not liable for a dangerous

condition in its streets *not arising from its own activities* unless it had actual or constructive notice of the danger)" (emphasis added).

■■■ Based upon *Dziewatkowski* and the above-cited Federal cases, we find that when an affirmative act of a municipality's agents or employees causes a dangerous condition, no actual or constructive notice of said condition is required.

Further, we find that there was evidence that the dangerous condition of the meter pit in question was created by defendant's employees and that these facts provided actual or constructive notice to the defendant; hence, the protection from municipal liability provided by section 3—102(a) did not apply. Consequently, we hold that the trial court erred in granting defendant's motion for judgment notwithstanding the verdict.

Next, plaintiff argues that the trial court improperly set aside the verdict and granted a new trial on the issues of liability and damages. On a motion for a new trial, a court will weigh the evidence before it, and, if the verdict is contrary to the manifest weight of the evidence, the court shall set aside the verdict. (*West v. City of Hoopeston* (1986), 146 Ill. App. 3d 538.) A verdict is not against the manifest weight of the evidence when it hinges upon inferences which may have been drawn from the evidence. (146 Ill. App. 3d at 543.) A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence. *Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082, 1089.

Harriet Harding testified that she contacted defendant's water department regarding her water bill in November 1986; she was told by the water department employee that someone from the department had checked the subject water meter in the days following the initial call. Mrs. Harding also testified that after Christmas 1986 or early in 1987, she saw two men standing over the subject water meter pit; the cover of the pit had been removed. Near them was a vehicle with defendant's logo upon it. Moreover, the water bill for the Harding residence dated January 6, 1987, was marked "regular," meaning that it was the result of an actual reading by a water department employee. On January 22, 1987, plaintiff fell into the subject pit because the lid was ajar. If placed properly upon the rim, the cover would have supported the plaintiff's weight.

■■■ Based upon this circumstantial evidence, the jury was entitled to find that employees of the defendant had taken the cover off the water meter pit and improperly replaced it, causing a dangerous condition, which brought about plaintiff's injury. Defendant's arguments

merely demonstrate that the evidence on pertinent issues is conflicting, not that a conclusion opposite the jury's is clearly evident or that the verdict was arbitrary and unreasonable. Accordingly, we hold that the court below erred in granting defendant's motion for a new trial.

■ Finally, plaintiff contends that the trial court erred in granting a remittitur of $40,000. The jury had awarded $40,000 for disability, $30,000 for past and future pain and suffering and $6,310.70 in medical costs. (*Chambers v. Rush-Presbyterian-St. Luke's Medical Center* (1987), 155 Ill. App. 3d 458.) A court of review will not disturb a jury's award of damages unless it is obviously the result of passion or prejudice. (*Chambers*, 155 Ill. App. 3d at 468.) Further, an award will not be considered excessive unless it falls outside the necessary limits of fair and reasonable compensation or it shocks the judicial conscience. *Shaheed v. Chicago Transit Authority* (1985), 137 Ill. App. 3d 352.

Plaintiff testified that following the accident she experienced substantial pain in her right leg. For a significant period of time she had to use crutches. At the time of trial, plaintiff was still unable to engage in the physical activities which had been very important to her prior to the subject injury. Dr. Cohen opined that, given the duration of her right knee problems, plaintiff's condition of ill-being could well be permanent.

This evidence supported the jury's verdict, which was not the result of passion or prejudice, nor does it shock the judicial conscience. Accordingly, we hold that the trial court erred in granting a remittitur of $40,000.

■ Defendant raises a number of issues that would properly be the subject of a cross-appeal. Nevertheless, the record before us contains no notice of cross-appeal. Accordingly, we find these issues are waived pursuant to Supreme Court Rule 303(a)(3) (134 Ill. 2d R. 303(a)(3)), and, therefore, we will not address them. *Benet Realty Corp. v. Lisle Savings & Loan Association* (1988), 175 Ill. App. 3d 227.

For the reasons stated above, we reverse the circuit court's judgment and remand this cause of action with direction that the trial court reinstate the jury's verdict.

Reversed and remanded with directions.

INGLIS, P.J., and BOWMAN, J., concur.