ALMA SMITH, Indiv. and as Mother and Next Friend of Tommy L. Smith, Plaintiff-Appellant, v. FINIS HOLMES *et al.*, Defendants-Appellees.

Fifth District   No. 5—91—0302

Opinion filed December 3, 1992.—Rehearing denied January 25, 1993.

John Womick, of Womick & Associates, Chartered, of Carbondale, for appellant.

Charles E. Schmidt and Stephen W. Stone, both of Brandon, Schmidt & Palmer, of Carbondale, for appellee Richard L. Holmes, trustee of the James Lynn Land Trust and Nicole Lynn Land Trust.

William J. Novick, of Fowler & Novick, of Marion, for appellees Finis Holmes and Mary Virginia Holmes.

John C. Ryan, Brad A. Elward, and Michael F. Dahlen, all of Fierich/Schoen/Mager/Green, of Carbondale, for appellee Richard L. Holmes, trustee of the Mik-Mar Land Trust, Jennifer Lynn Land Trust, Darren Lynn Land Trust, and Samantha Lynn Land Trust.

Brian P. McGarry, of Marion, for appellees Jim Shotton and Jim Shotton Construction Company.

William L. Berry and James D. Green, both of Dunham, Boman & Leskera, of Belleville, for appellees Richard L. Holmes and Linda Holmes.

JUSTICE H. LEWIS delivered the opinion of the court:

The plaintiff, Alma Smith, individually and as mother and next friend of Tommy L. Smith, appeals the judgment of the trial court entered against her and in favor of the defendants herein on their motions for summary judgment. On April 23, 1988, Tommy Smith, who was 15 years old at the time, suffered serious brain damage as a result of oxygen deprivation that occurred while he played with the rope on a swing set. This incident occurred while Tommy Smith was visiting his friend Dwayne Bradley, who lived in an apartment complex owned by a number of the defendants. Other of the defendants were involved with maintenance upon the property, and the defendants Jim Shotton and Jim Shotton Construction Company were alleged to have manufactured the swing set. The plaintiff presents

three issues for review: (1) "[w]hether the Trial Court erred in not applying Section 343 A of the Restatement of Torts Second to the facts of this case, and in holding that an open and obvious danger was a total bar to recovery"; (2) "[w]hether the defective swing set did not constitute such an open and obvious danger that could have been appreciated by an adolescent male"; and (3) whether the trial court erred in striking the affidavits of expert witnesses.

A number of discovery depositions accompany the defendants' motions for summary judgment. They indicate that on Friday, April 22, 1988, Tommy Smith stayed overnight as a guest at Dwayne's family's apartment, as Tommy had done on numerous prior occasions. The following morning, while Dwayne was cleaning his room, Tommy was outside the apartment in the area of the playground talking with four girls, namely, Holly Lezu, Felecia Maddox, Jennifer Maddox, and Jennifer Short. A swing set stood in the area of the playground. Originally the swings had wooden seats, but the seats had broken, and none remained. The seats had been attached to the frame by ropes knotted to hold them in place. Apparently a child had tied together two ropes that had held one of the seats, and some of the children used the knotted loop to swing by placing a foot in it. One of these two ropes that were tied together was longer than the other, and a length of rope dangled from the knot. In the rope there were a number of knots, which children used in order to climb to the top of the swing set.

Holly Lezu, who was born on April 5, 1972, and at the age of 16 years at the time of the accident was the oldest of the four girls present, testified as follows in a discovery deposition taken on April 24, 1990:

> "We walked to the playground, and we were talking. There was this set of monkey bars ***. Us three girls were standing there—or four girls. We were talking, and then he [Tommy] walked over to the swing set, and he put the rope around his neck, and he goes, 'I'm going to hang myself.' I said, 'Tommy, that's stupid. Don't do it.' He said, 'I'm not. I'm just kidding. I'm just playing.' So we said, 'Okay.' For a while he talked to us while he was standing there, and he could still touch the ground.
>
> Q. Did he have the rope around his neck at the time?
>
> A. Yes. And, we were still talking to him. Then about five minutes later, his back was toward us. His back had been turned toward us. Jennifer [Maddox] started getting scared—the little girl. She goes, 'I think he's actually doing it.' I go,

'Doing what?' She goes, 'I think he's hanging himself.' She goes, 'He's not joking.' I go, 'Yes, he is. Don't worry about it.' Me and her older sister, Felecia, told her not to worry about it. Me and Felecia told him, we said, 'Tommy, you're scaring us. Please quit.' We sat there I guess for about thirty seconds, and then we go, 'Tommy, you're scaring us. We're leaving.'

Q. Did he say anything to you?

A. No. He had his back toward us, so he didn't say anything and we didn't say anything. We go, 'We're leaving. We're going in.' So, we went into my apartment.

Q. Which is way up in the Mik-Mar area?

A. Right. We sat there for approximately fifteen to thirty seconds. I don't know. Then we looked out the window, and he was still there. So, we called Dwayne and told Dwayne he was playing a joke on us, but he was still out there at the playground, and we asked him if he would go get him. When he did, then Dwayne got him off the rope. We ran outside, and by the time I got there, his [Dwayne's] mom and dad were out there giving him CPR.''

Concerning the rope, Holly Lezu responded to questions as follows:

"Q. Did you actually see him take the rope and put it around his neck?

A. Yes, but I don't recall him tying any knot or anything of the sort.

Q. Was the rope he put his head into already there created or did he have to create it himself?

A. I don't think it was created. Not that I know of.

Q. You're saying it wasn't there beforehand?

A. I don't think so.''

The witness recalled that prior to this accident a loop, as described above, already existed:

"[I]t was already made, and we used to put our foot in there and swing from it.

Q. Did your brother used to do that? Zach?

A. No. I did.

Q. What you're saying is Tommy didn't put his head through that portion?

A. No. He used the bottom of it.

Q. In other words, you're saying he fashioned this portion he put his head in himself?

A. Yeah. He just—like when I saw him, he was putting the rope around his neck, but I turned away to talk to Jennifer Short, and when I turned back around, it was already there.

Q. Did you see him tie a knot or anything like that?

A. No.

Q. So when he actually completed it, you were looking—

A. Right. I was looking in the other direction.

Q. Now, you say after he did this, he was looking towards you, and he was making comments about he was going to hang himself?

A. (Witness nods.)

Q. How long was he facing you?

A. For about five minutes, because we talked.

Q. You were talking this whole time?

A. Uh-huh. Then he turned away, and I guess his back had been toward us for approximately four to five minutes, but we had talked to him a minute or two between there. Then after awhile, it got silent, and Jennifer, the little girl, started getting scared, and that's when we went in.

Q. Did you happen to notice his face as you were talking to him? Did it change colors or anything?

A. No.

Q. Did it look normal?

A. Yeah.

Q. Did you actually see him turn around?

A. No. He took his feet and moved and looked that way and then looked back at us, and he said something to us, and we said something back to him, and then his back was, you know, against us.

Q. If I get this right, he was facing you, and then he took his feet and turned himself so his back was towards you—

A. Then he turned around and said something to us, and then he turned back around.

Q. When he said something to you that last time, how did his voice sound?

A. It sounded fine.

Q. Sounded normal?

A. Yeah.

Q. Did he sound distressed at all?

A. No.

Q. Did it sound strained?

A. No.

Q. Then there was a period of two to five or three to five minutes that you were saying he was facing you for the last time?

A. Okay. When he faced us to talk to us—

Q. I'm sorry. When his back was facing you.

A. It was about two to three minutes. Then he was scaring Jennifer, and then about two minutes after that, we went in, and then after about a half minute being in my house, we called Dwayne Bradley, and he went out there.

Q. How old is this young girl?

A. She was about eight or nine at the time.

Q. What was her name?

A. Jennifer.

Q. Jennifer Short?

A. Jennifer Maddox.

Q. Did you see his—Tommy's face at all in the last couple of minutes while you were on the playground?

A. (Witness shakes head from side to side.)

Q. Did he say anything to you at all during that time?

A. No.

Q. When you went inside then, did you have any reason to believe he was in any trouble?

A. We figured that he was just joking, that if we came inside, he would get up and realize, 'Well, they know I'm just kidding', and he'd go back in. We looked out my door window, and he was still there. That's when we realized something was wrong and we called Dwayne, because he's a pretty big guy, so we figured he would be able to do something. Then Dwayne went out there, and we followed him, and by the time I got out there, Dwayne's parents were already out there.

Q. Do you have any—well, first of all, what made you look out the window?

A. Curiosity to see if he was still there.

Q. Who was it that looked out the window?

A. I did.

\* \* \*

Q. As you saw the rope before the accident and perhaps the morning of the accident, it appeared to have a large loop with a knot of some sort in the bottom and a piece of rope extending down from that knot?

A. Yes.

Q. Do you know how long that rope was from the top of the play set to wherever it stopped? If you don't know, that's okay.

A. About six feet. It's about two feet from the ground—the bottom of the rope came about two feet from the ground. The swing set, I guess, is approximately eight feet tall, nine.

Q. The bottom of the loop, do you know how far that was from the level of the ground?

A. No. I don't remember.

Q. How tall would you say Tommy was?

A. About five nine, five ten.

Q. Do you know about what his weight was?

A. About 150.

Q. When he got into the rope and had it around his neck, was he standing up?

A. Yes.

Q. Did you see him then lean forward or something like that?

A. No. The way it looked when he had turned toward us the first time to talk to us, it looked like he had just leaned it up against his chin—the bottom of his chin."

The witness indicated that Tommy had remained standing with his feet flat on the ground while the girls were outside with him. She did not remember seeing any of the rope dangling once Tommy had put it around his neck. As she observed and talked with him in the playground area, she was approximately 18 to 20 feet from him. She estimated that it would take about a minute to walk from the playground to her window. The rope had broken at the end of the summer of 1987 and had been that way for about eight months. She described the loop that had been tied prior to this incident as being of sufficient height above the ground that only bigger children would use it to swing. She did not know who had tied the knot to create the loop. Concerning the rope, the witness testified further:

"Q. The loop that he [Tommy] had his neck within on the date that this happened, do you recall ever seeing that loop before the day he was hurt?

A. Seeing the loop at the top here [as shown in a photograph]?

Q. No, not the one you put your foot in. The loop that he had around his neck.

A. I never seen the loop that he had around his neck.

Q. So we're clear, Holly, the loop that's shown in this photograph that you would put your foot in and swing from was not the loop that he had his neck within, is that correct?

A. Correct.

Q. There was another loop on the day of this accident that you hadn't seen before and didn't see after the day of the accident, is that correct?

A. Correct.

Q. Do you know who made that loop?

A. No.

Q. Could Tommy have made it?

A. He could have.

Q. Do you recall seeing him putting the rope around his neck that morning?

A. He started to, and then I turned away, and then when I turned back, he had already had it around his neck.

Q. Did you see him tie a knot after he wrapped the rope around his neck?

A. No.

Q. When he started to put the rope around his neck that day, at that time did you see the loop that he eventually ended up with around his neck?

A. No.

Q. So would it be reasonable based on your observations—based on what you saw, would it be reasonable to conclude that the loop that was around his neck at the time he was hurt was made that morning while he was out there by him?

A. Yes.

Q. Holly, you did not see him necessarily tie a knot?

A. Correct.

Q. Is that correct? As you sit here today, do you know whether he actually made a loop around his neck and tied it in a knot or whether he may have just wrapped it around his neck several times and leaned against it?

A. From what I saw when he—he could have just wrapped it around and like maybe hooked it so it wouldn't have came [sic] loose. That's the way I would figure.

Q. Why do you say that?

A. Just because he was just kidding, so I figured that—I don't know.

Q. You did not see when someone came out and took him down from the rope, did you? Were you there when that was done?

A. Huh-uh."

The witness reiterated that the part of the rope that Tommy put around his neck was the part hanging below the loop used for swinging. When she looked out the window upon reaching her apartment, she noticed that Tommy's feet were still touching the ground but that his legs were now bent. At the time of the accident she was five feet five inches tall, the loop being approximately at the level of her chest.

Felecia Maddox, whose date of birth was June 6, 1973, described the incident as follows during a discovery deposition taken on April 28, 1990:

> "Holly and I got on the monkey bars with the two Jennifers, and Tommy stayed over by the playground where the swings were. He put the knot on his neck, and he kept saying he was going to hang himself, but we thought he was kidding. We keep [sic] telling him to stop. We said that a lot of times. We thought if we left, he would get away from it, but he never did. So, we went to Holly's house and looked out the window, and he was still there, so we called Dwayne."

Although the witness noticed Tommy dangling the rope with his hand and playing with it, she did not know what part of the rope he had around his neck or whether he had made a knot in it. She described him as standing with his feet touching the ground. His legs were straight, but he was leaning forward, she said, and "[h]e like gradually went down." She said that her sister Jennifer had walked over to him, had seen his face, and had said: "[H]e had like foam coming out of his mouth, and that's when we really got scared, and we went and told Dwayne's mom." After that observation by Jennifer, she indicated, the girls had run to Holly's apartment and had called Dwayne.

Jennifer Maddox, whose date of birth is November 11, 1978, testified during a discovery deposition taken on April 28, 1990: "Tommy was fooling around. He was putting the loop around his neck and saying he was going to hang himself. We kept on telling him not to, and he said, 'I'm just playing around.' Then he just laid there." After this brief statement, the witness left the room crying and did not testify further.

Jennifer Short, whose date of birth is February 4, 1974, testified during a discovery deposition taken on April 24, 1990: "[Tommy] was like playing around with that rope. I don't remember if he tied a knot in there or anything, but it was just like ***." The witness was unable to testify further because she was too distraught emotionally, and the deposition was adjourned.

Dwayne Bradley testified during a discovery deposition taken on April 23, 1990, that he had not been present at the site of the acci-

dent until he had gone to check on Tommy in response to the telephone call from one of the girls. He described Tommy as "dead" when he saw him, with his legs buckled beneath him although, he said, Tommy could have stood up. He described the condition of the swing set prior to the incident: "It was a wooden base swing set. It had—none of the swings were connected. Those all broke. There was nothing there. There's a noose in there already, and the kids would put their foot or something in there and swing around in there." He testified further that he did not think that Tommy had had to tie the rope because the loop, or "noose," had already been tied in it. He stated, however, that no one had ever told him exactly what had taken place. He indicated that the "noose" in the rope was about four or five feet above the ground. When the witness found Tommy, he had "stooped down" about a foot below his height. He said, "I started to take him off, and then my dad came over, and he pulled him off of—I mean he pulled the thing off, and we put him down on the ground." The witness also testified:

> "When we got there—when I got there, I pulled that off, and it wasn't even—I just yanked it and it just came through. I mean it wasn't even—you know how hanging nooses comes [*sic*] in like that? That wasn't even connected hardly. All I did was went like this, and he came out, and I picked him up and put him down."

Asked, "How much effort did you have to use to pull the knot free?" the witness responded: "Not really much. Just pulled it." He indicated that in order to remove the rope, he lifted Tommy and pulled on one side of the rope while his father "pulled the other side." He testified as follows in response to these questions:

> "Q. Whenever you say that you pulled the rope and you pulled it off, you mean the knot came undone in the noose? Is that what you meant?
>
> A. It wasn't like real tight. It was loose. I had him up there and pulled like right here, and my dad was on the other side and he—I don't know what he did, but he was real easy to get off.
>
> Q. How much rope was hanging from the noose that you pulled on hanging down below the noose?
>
> A. I don't know.
>
> Q. Was this tied in a slip knot? Do you know what a slip knot is?
>
> A. Yeah. I think this was a regular, not [*sic*] just tied. It didn't slip down or anything. It was like—his neck was, I guess,

pretty big. It was like a little bit—I'd say about an inch off— you know, noose up to the neck. It wasn't a slip down knot.

Q. Did somebody tie it like a hangman's noose?

A. No."

When he was asked, "You don't know whether Tommy made any other kind of maneuver in the rope or changed the rope at all?", the witness answered, "No." Asked further, "When you took Tommy out of the rope that morning, there was no longer a noose or loop or anything in the rope, is that correct?" the witness responded, "I don't think there was, no."

Ross Bradley, Dwayne's father, testified during a discovery deposition taken on April 23, 1990, that when he arrived at the scene of the accident, "Dwayne was trying to get Tommy off as I was running there and couldn't, you know, handle him. I picked him up, and Dwayne took the rope from his neck." He described Tommy as blue, without pulse or respiration. The witness stated that Tommy could have stood and not hung himself. He had not observed a loop and knot in the rope and did not know whether the loop had come undone when the rope was removed from Tommy because he had been absorbed in aiding him.

Alma Smith testified during a discovery deposition taken on April 27, 1989, that Tommy had become 15 years old on January 30, 1988, that she had never been informed that he was mentally retarded or deficient, that she had no belief that he was mentally deficient, and that he had never been enrolled in any special education program. He had repeated the sixth grade, she said, because of poor academic performance following the death of his father. However, prior to and following that time he had no academic problems.

In entering summary judgment in favor of the defendants and against the plaintiff, the trial court ruled that there is no genuine issue of material fact to be resolved and that whether Tommy Smith tied a knot in the rope himself is not a material fact. The court ruled further that "[a] rope is not inherently dangerous, any more than a pencil or a butter knife or a pillowcase or a rock is," and that "[t]he risk of placing one's neck in a loop of a rope is open and obvious, and one which the law expects a child of 15 to appreciate and avoid." The court determined that on these facts the defendants did not owe a duty to the plaintiff and that, therefore, they are entitled to summary judgment as a matter of law.

With reference to the first issue she raises on review, the plaintiff takes the position that the facts of the instant case indicate the presence of no open and obvious danger. Assuming *arguendo* that the

swing constituted an open and obvious danger, she says, the trial court erred in holding that this open and obvious danger prohibited plaintiff from recovering under any circumstances and, therefore, improperly entered summary judgment. Plaintiff urges that the swing set was "obviously negligently maintained and dangerous" and stresses the fact that at the time of the incident Tommy's feet were supported on the ground. Plaintiff argues that the risk unappreciated by Tommy was "the risk of cutting off the flow of oxygen to his brain by simply leaning into the noose." This risk, she states, was not open and obvious and could not have been appreciated by an adolescent male of Tommy's age. In urging the application of section 343A of the Restatement (Second) of Torts (1965), plaintiff suggests that Tommy as a teenage boy was temporarily distracted by the teenage girls present at the playground area and was, like the customer carrying a large bundle in *Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 152, 554 N.E.2d 223, 232, "forgetful of the condition." Section 343A operates as an exception to section 343 of the Restatement (Second) of Torts (1965) and addresses known or obvious dangers. (See *Deibert v. Bauer Brothers Construction Co.* (1990), 141 Ill. 2d 430, 566 N.E.2d 239.) Concerning the second issue she raises on review, plaintiff reiterates her argument that the "cutoff of oxygen to the brain of the child" was neither open nor obvious and asserts that the trial court erred "by not allowing the jury to determine whether or not a negligently maintained swing set was a dangerous condition, and that Tommy's injuries resulting from the negligently maintained swing set were foreseeable." Although the plaintiff alleges in her amended complaint that Tommy had "an actual mental age of approximately 12 years" despite a chronological age of 15 years, the record is devoid of evidence to support this allegation.

In largely separate briefs the defendants advance two principal arguments in support of the trial court's entry of summary judgment in their favor, namely, that the rope by which Tommy was injured does not constitute a dangerous condition and that, assuming *arguendo* that a rope is a dangerous condition, the risks posed were open and obvious ones that a 15-year-old child would be expected to appreciate and to avoid. Most of the defendants urge that Tommy was injured as a result of his misuse or abuse of an object that is not inherently dangerous, that is, a piece of rope.

Summary judgment is a drastic means of disposing of litigation and, thus, should be allowed only when the right of the moving party is clear and free from doubt. (*Logan v. Old Enterprise Farms, Ltd.* (1990), 139 Ill. 2d 229, 564 N.E.2d 778.) A motion for summary

judgment shall be granted only if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005(c); *Logan*, 139 Ill. 2d 229, 564 N.E.2d 778.) The court must construe the evidence strictly against the movant and liberally in favor of the opponent. *Logan*, 139 Ill. 2d 229, 564 N.E.2d 778.

In order to succeed on a claim of negligence, a plaintiff must prove the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately resulting from the breach. (*Deibert*, 141 Ill. 2d 430, 566 N.E.2d 239.) Whether a duty exists in a particular case is a question of law to be determined by the court. (*Ward*, 136 Ill. 2d 132, 554 N.E.2d 223.) A duty exists when the defendant and plaintiff stand in such a relationship to one another that the law imposes upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff. See *Ward*, 136 Ill. 2d 132, 554 N.E.2d 223.

The customary principles of ordinary negligence must be applied to determine the liability of owners or parties in possession or control of premises upon which a child is injured. (*Corcoran v. Village of Libertyville* (1978), 73 Ill. 2d 316, 383 N.E.2d 177.) A duty that would not be imposed in cases of ordinary negligence will be imposed upon an owner or occupier of land for the personal injuries a child suffers on the premises only if the landowner or person in possession knows or should have known that children frequent the premises *and* if the cause of the child's injury was a dangerous condition on the premises. (*Newby v. Lake Zurich Community Unit, District 95* (1985), 136 Ill. App. 3d 92, 482 N.E.2d 1061.) If both of these elements are satisfied, the injury to a child is deemed sufficiently foreseeable for the law to impose upon the owner or the occupier of the land a duty to remedy the dangerous condition. (*Newby*, 136 Ill. App. 3d 92, 482 N.E.2d 1061.) For the purposes of this standard, a "dangerous condition" is one likely to cause injury to a child who, because of his or her immaturity, might not be capable of comprehending or avoiding the attendant risks. (*Newby*, 136 Ill. App. 3d 92, 482 N.E.2d 1061.) However, if the condition involves obvious risks that children generally would be expected to appreciate and to avoid, there is no duty to remedy the condition. (*Newby*, 136 Ill. App. 3d 92, 482 N.E.2d 1061.) No action may be maintained if children of a similar age and experience as the plaintiff are capable of understanding the danger involved. (*Newby*, 136 Ill. App. 3d 92, 482 N.E.2d 1061.) Since children are ex-

pected to avoid dangers that are obvious, under such circumstances there is no reasonably foreseeable risk of harm. (*Newby*, 136 Ill. App. 3d 92, 482 N.E.2d 1061.) Even where an owner or occupier of land is aware that children frequent the premises, the law does not require the landowner or possessor of land to protect against the omnipresent possibility that children will injure themselves on obvious or common conditions. (*Newby*, 136 Ill. App. 3d 92, 482 N.E.2d 1061.) In sum, although the foreseeability of harm to the child is the test for ascertaining liability, the law does not allow recovery for injuries that are caused by an obvious danger. (*Newby*, 136 Ill. App. 3d 92, 482 N.E.2d 1061.) Moreover, an instrumentality or product does not become inherently dangerous, and therefore a "dangerous condition," merely because there is an abuse of it or because it is used for a wrongful purpose. *Newby*, 136 Ill. App. 3d 92, 482 N.E.2d 1061; *Hootman v. Dixon* (1984), 129 Ill. App. 3d 645, 472 N.E.2d 1224.

As we have stated, the trial court found that a rope is not inherently dangerous and that the risk of placing one's neck in a loop of a rope is open and obvious and one that the law expects a child of 15 to appreciate and avoid. The rope as Tommy found it was not a dangerous condition upon the premises. Holly Lezu testified upon deposition that Tommy did not put around his neck the loop previously created for swinging by another child. Even if one infers from the testimony of any of the other witnesses that he did put his neck within that loop, the testimony of Holly Lezu stands unrefuted that he wrapped around his neck a length of rope that was merely dangling from that loop and, in that condition, he turned his body 180 degrees. He appears to have miscalculated tragically his ability to contain the risk he himself created by his abuse of the rope on the swing set. Nevertheless, his abuse of the rope did not render it inherently dangerous. Furthermore, the condition of the rope on the swing set was not one likely to cause injury to a child who, because of his or her immaturity, might not be capable of comprehending or avoiding the attendant risks. By his abuse or misuse of the rope Tommy himself created the attendant risks.

We find instructive the case of *Hootman v. Dixon*, in which a 12-year-old boy was killed when the concrete roof of a small, brick building collapsed upon him as he and two 10-year-old friends attempted to knock the building down. When the boys began, the brick building had holes in each of its walls large enough for two people to walk through. The three boys were trying to knock the building down by using hammers and pieces of brick to knock still more bricks from the walls. The area where the building was located was often played in by

the local children, and the defendants, who were aware of that fact, had made no attempt to keep the children out. A 15-year-old friend had told the boys to stay away from the building or they might get hurt. The two younger boys, at least, had planned an escape route by clearing a path out of the building and placing a mattress just outside on which to jump. In *Hootman* the defendants argued, as do the defendants here, that the brick building was not a dangerous condition, as required for imposing liability on the property owners, because the risk of the ceiling's collapse was an obvious risk and because the building was not inherently dangerous. Upon review the court found that the brick building did not constitute a dangerous condition because the risk it presented was an obvious risk and because the building was not an inherently dangerous condition. The building had not collapsed of its own accord but only after the three boys, using hammers and bricks, had purposely knocked bricks out of its support walls until the walls could no longer support the weight of the concrete roof. The court concluded that it was this misuse of the building, an object that was not otherwise inherently dangerous, that had caused the death of the deceased. Similarly, in the case at bar, it was Tommy's misuse of an object not otherwise inherently dangerous that caused his injuries. Because the rope attached to the swing set was not inherently dangerous, the rope did not constitute a dangerous condition and the defendants owed no duty to Tommy to remedy the condition. Therefore, the trial court properly entered summary judgment in their favor and against the plaintiff.

■ Concerning the final issue plaintiff raises, she contends that the trial court erred in striking the affidavits of Dr. T.J. Fitzgerald and Dr. H. Dan Corbin. The trial court granted a motion to strike these affidavits as violative of Supreme Court Rule 191 (134 Ill. 2d R. 191). In his affidavit Dr. Fitzgerald expressed the opinion as a psychologist: "Neither Tommy Smith, nor any other child similarly situated, would have perceived the danger, which consists of leaning into the rope and having the blood circulation cut off to the brain, resulting in one passing out and then falling and suffering injuries, as obviously happened to Tommy Smith. This type of risk is not open and apparent, and could not have been perceived by any 15-year-old adolescent." Dr. Corbin stated in his affidavit that the swing set should have been constructed using chain, not rope, in part because "chains cannot easily be made into loops," and that an adolescent boy would not understand the nature and significance of the risk of placing his neck in a noose. Dr. Corbin stated further that had the swing set been properly maintained, there would have been a base on the

swing and the rope would not have been available to have been made into a noose. In view of our determination that the rope attached to the swing set was not inherently dangerous and did not create a dangerous condition, we do not consider the plaintiff's assignment of error with respect to the striking of these affidavits.

Affirmed.

WELCH and CHAPMAN, JJ., concur.