# Illinois Official Reports

## Appellate Court

---

### *Racky v. Belfor USA Group, Inc.*, 2017 IL App (1st) 153446

---

| | |
|---|---|
| Appellate Court Caption | MEGHAN RACKY, Special Administrator of the Estate of MICHAEL J. RACKY, Deceased, Plaintiff-Appellee, v. BELFOR USA GROUP, INC., d/b/a Belfor Property Restoration, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-15-3446 |
| Filed | June 16, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-4466; the Hon. James M. McGing, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Tia C. Ghattas, James G. Argionis, and Elisabeth C. Ross, of Cozen & O'Connor, of Chicago, for appellant.<br><br>Michael W. Rathsack, of Law Office of Michael W. Rathsack, and Thomas M. Paris, both of Chicago, for appellee. |
| Panel | JUSTICE REYES delivered the judgment of the court, with opinion.<br>Presiding Justice Gordon and Justice Hall concurred in the judgment and opinion. |

**OPINION**

¶ 1     Plaintiff Meghan Racky, special administrator of the estate of Michael J. Racky, brought this premises liability action against defendant Belfor USA Group, Inc. (Belfor), along with others not parties to this appeal, alleging negligence in the death of her father Michael Racky, who died as a result of falling through a plate glass window of a property Belfor had been remodeling. Following a bench trial, the trial court found in plaintiff's favor and awarded damages in the amount of $1.875 million to plaintiff after finding the decedent to be 25% contributorily negligent.

¶ 2     Belfor appeals, arguing that (1) the trial court erred in entering judgment in favor of plaintiff where the evidence failed to establish that it had a duty because (a) it was not a possessor of the property, (b) the decedent encountered an open and obvious danger, and (c) the window was outside the scope of Belfor's contract and (2) the trial court erred in awarding damages on both the survival and wrongful death counts where (a) the evidence did not establish the decedent experienced conscious pain and suffering and (b) the amount of the damage award falls outside the range of reasonable compensation. For the reasons that follow, we affirm.

¶ 3                                           BACKGROUND

¶ 4     This case involves the death of the decedent after he fell through a plate glass window located at 4823 West 95th Street in Oak Lawn (the property). The property, a strip mall, consisted of a number of stores. The store primarily at issue in this case, however, is Miss Fantasia Boutique (the boutique), which was situated near the corner of 95th Street and Lacrosse Avenue. The boutique's storefront, which faced both 95th Street and Lacrosse Avenue, consisted of large plate glass windows set into a low parapet wall.

¶ 5     Six months prior to the decedent's death, a fire had broken out at Eva's Bridal Salon, a store located in the middle of the property. The stores to the east of the bridal salon were not as affected by the fire and reopened shortly thereafter. The stores to the west of the bridal salon, however, were quite damaged and in need of repair. Ace Boarding Company was immediately hired to secure the property. Two days later, on November 19, 2010, Belfor was hired by the owner of the property, Evans Karnezis, to perform fire remediation services on the stores that sustained fire damage, including the boutique. Belfor then commenced its work, which included boarding up the property and repairing the damage caused by the fire and smoke.

¶ 6     Thereafter, on March 21, 2011, Belfor entered into a second contract with Karnezis regarding demolishing the interior of the property, including the interior of the boutique. These efforts included tearing down the walls between the stores on the west side of the property. The intention was ultimately to remodel the interior and exterior of the entire property; however, the March 21, 2011, contract only involved interior work. Belfor completed this stage of the project on April 26, 2011. Thereafter, Belfor continued to access the property while obtaining bids for the final stage of the remodeling project. On May 24, 2011, the decedent fell through the boutique's plate glass window adjacent to Lacrosse Avenue, severely lacerating his leg and succumbed to his injuries. It should be noted, despite Belfor's remediation efforts, the boutique never reopened.

¶ 7        Subsequently, plaintiff filed the instant lawsuit. The operative complaint in this matter, the fourth amended complaint, alleged various counts against Karnezis and the boutique. Those counts, however, were disposed of prior to trial and are not at issue in this appeal. The only counts remaining for adjudication were those against Belfor for survival and wrongful death based on a premises liability theory. Plaintiff alleged that Belfor had exclusive possession of the property at the time of the decedent's accident and knew or should have known about the dangerous condition of the boutique's plate glass window. Thus, by not guarding against the dangerous condition, Belfor proximately caused the injury suffered by the decedent and was responsible for the damages that were incurred as a result.

¶ 8        The matter then proceeded to a bench trial, where the following facts are adduced from 21 witnesses. Plaintiff presented the following witnesses: (1) Ricardo Rodriguez, the eyewitness to the accident; (2) Patricia Lynch, the owner of Miss Fantasia Boutique; (3) Evans Karnezis, the owner of property where the boutique was located; (4) Dr. Theresa Schwab, an emergency room physician who treated the decedent; (5) Tim English, Belfor's project manager; (6) Henry Manalli, Belfor's general manager; (7) Mark Meshulam, an expert in the field of building engineering; (8) Dennis Puchalski, an expert in construction safety; (9) Sean Racky, the decedent's son; (10) Meghan Racky, the decedent's daughter; (11) Matthew Racky, the decedent's son; (12) Molly Racky, the decedent's daughter; and (13) Patricia Harthun, a licensed clinical professional counselor.

¶ 9        Defendant's witnesses were as follows: (1) Dr. Jerry Bauer, an expert on conscious pain and suffering; (2) Dr. Patrick Ng, former chief toxicologist for the Cook County office of the medical examiner; (3) Dr. Christopher Long, chief toxicologist for St. Louis County, Missouri; (4) Officer Michael Quinn, a police officer with the Oak Lawn police department; (5) Michael Loughney, a firefighter engineer with the Oak Lawn fire department; (6) Andrew Nieto, an expert in construction safety; (7) Lindsay Anderson, a glass expert; and (8) Dr. Andrew Kulik, a psychologist and an expert in the field of psychiatry.

¶ 10                                A. The Accident

¶ 11        Ricardo Rodriguez, the only eyewitness to the accident, testified that on May 24, 2011, at 1 p.m., he was traveling east along 95th Street in Oak Lawn as a passenger in his wife's vehicle when he observed the decedent crossing 95th Street on a bicycle.[1]

¶ 12        As Rodriguez observed the decedent ride his bicycle across 95th Street, he did not find the decedent's actions to be unusual. As the decedent approached the curb in front of the boutique, he "jumped" his bicycle, *i.e.*, lifted his front and back tires over the curb, and then "wobbled a little on the bike" as he attempted to pedal forward.[2] At this point, the decedent was on the sidewalk near the side of the boutique's plate glass window, which was adjacent to Lacrosse Avenue. Rodriguez then observed the decedent place his left hand on the window in an apparent attempt to balance himself. Rodriguez was asked to demonstrate how high off the

_____

[1]Regarding the intersection at 95th Street and Lacrosse Avenue, defendant's witness Officer Michael Quinn testified that it is a six-lane road with three lanes in each direction. Quinn further testified that there is no traffic signal at that intersection of 95th Street and Lacrosse Avenue nor is there a crosswalk.

[2]On cross-examination, Rodriguez testified that at the time he did not notice the curb was a "double curb," and indicated that it was unusual for someone to try to "jump" a double curb on a bicycle.

- 3 -

handle bars the decedent touched the window. The court stated, "Just for the record, the witness is indicating a height—can you put your hand back again? And where are the handlebars? The Court's estimate is that's somewhere from eight to 12 inches off the handlebars."[3] Rodriguez then observed the decedent fall through the window. Rodriguez testified that the decedent did not appear to be intoxicated. When asked by plaintiff's counsel whether he was able to make a statement regarding the amount of pressure Rodriguez believed the decedent had exerted on the window, Rodriguez replied, "I want to say light." Rodriguez then explained, "Because he had his bike. It wasn't leaning or anything. It was balanced just when his hand was on the window that he fell." Rodriguez, however, later testified on cross-examination that he did not know how much force the decedent used when he touched the glass or the amount of force the decedent's body exerted on the glass on impact. Oak Lawn police officer Michael Quinn, however, testified that Rodriguez informed him that the decedent lost his balance and "crashed" into the plate glass window.[4]

¶ 13    Upon observing the decedent fall through the window, Rodriguez shouted to his wife, who stopped their vehicle in the middle lane of traffic. Rodriguez exited the vehicle, ran towards the decedent, and called 911. The decedent's upper body was inside the boutique and, from the thighs down, his legs were outside, draped over the parapet wall. Rodriguez testified he heard "a gurgling sound like a moaning." Rodriguez then demonstrated the sound for the court and testified the sound continued for two or three minutes.[5]

¶ 14    Glen Lyman, an off-duty emergency medical technician, arrived on the scene a few minutes after the incident occurred. Rodriguez moved the decedent's bicycle out of the way and Layman attempted to stop the decedent's leg from bleeding, but ultimately was unsuccessful. Rodriguez testified that the decedent continued moaning during this time, but he could not see whether the decedent's eyes were open because the decedent was wearing sunglasses. The decedent also did not make any movements.

¶ 15    Shortly thereafter, the Oak Lawn fire department arrived. Michael Loughney, a firefighter engineer, testified that when he arrived at the accident scene at 1:20 p.m., he observed the decedent's legs hanging out of the window. The jagged glass that remained in the window made it too dangerous for him to enter the boutique through the window. A short time later, the fire engine crew arrived and forced the door to the boutique open. He entered in through the front door and observed a large amount of blood on the floor.

¶ 16    Loughney approached the decedent and noticed an odor of alcohol. Loughney testified that at no point was the decedent responsive; he did not respond to questions, had no muscle control, his eyes had no reaction to light and did not move, and the decedent had no blood

[3]On cross examination, defense counsel again asked Rodriguez how high the decedent's hand was when it touched the glass, and Rodriguez again demonstrated that it was 8 to 12 inches from the handlebars. When asked a third time Rodriguez replied, "I want to say arm's length." The court then acknowledged for the record that his hand was motioning in the same fashion "reaching towards to his left with his left hand" and that the decedent touched the glass "at about the middle of the glass."

[4]Officer Quinn later clarified that his report would not have any different meaning if he used the phrase "fell through the window" as opposed to "crashed through the window."

[5]During Rodriguez's cross-examination, the court stated the following, "He originally said gurgling. Then he said groaning, and then he gave an example of the sound that he heard, which to the Court was something on the order of oh, o-h, with a number of H's behind it, perhaps."

pressure or pulse. He was, however, taking three breaths a minute, although Loughney testified that amount of breathing was not enough to support life and could be made by a person who is unconscious. The decedent did not regain consciousness during the 13-minute drive to the hospital.

¶ 17    B. The Decedent's Medical Treatment and Toxicology Reports

¶ 18    Dr. Theresa Schwab, a physician in the emergency department at Advocate Christ Medical Center, testified that on May 24, 2011, she assisted in the treatment of the decedent. The decedent arrived in cardiac arrest, and her attempts to resuscitate him were unsuccessful. She believed the decedent's death occurred due to a near amputation of his leg that led to significant blood loss. There was no external evidence of neck or head trauma.

¶ 19    Dr. Schwab also testified regarding whether the decedent was conscious at the time of the accident so as to experience pain. According to Dr. Schwab, there is "a spectrum of level of consciousness *** all the way from complete brain death to awake and fully oriented." Accordingly, doctors assume that individuals who are not brain dead experience pain, and anyone who demonstrates any signs of consciousness is treated for pain. Dr. Schwab further opined that the decedent would have experienced conscious pain and suffering at the time he fell through the window. Dr. Schwab based her opinion on the severity of his injuries and the testimony that the decedent was groaning for a few minutes after suffering the injury.

¶ 20    During the trial, Belfor called Dr. Jerry Bauer, a neurosurgeon, to testify as an expert on the issue of conscious pain and suffering. After reviewing all of the records in this case, Dr. Bauer opined that the decedent consciously experienced pain for some unknown period of time from the point when he was first cut by the glass, while he was moaning in Rodriguez's presence, and prior to the Oak Lawn fire department's arrival. Dr. Bauer based his opinions on the fact that an unconscious person cannot ride a bicycle, thus the decedent must have been conscious while he was experiencing being cut by the glass, and groaning in pain because of it. Dr. Bauer also testified that the decedent fractured his right hip in the fall and that one would not be able to ride a bicycle with such a broken hip, thus he would have experienced pain with that fracture. Dr. Bauer testified, however, that a 0.203 blood alcohol level would reduce some effects of pain.

¶ 21    Dr. Patrick Ng testified that in 2011 he was the chief toxicologist for the Cook County office of the medical examiner. In this capacity, Dr. Ng testified regarding the effects of alcohol. According to Dr. Ng, the decedent's blood alcohol concentration at his time of death (1:54 p.m.) was 0.203, but it would have been higher, about 0.283 two to three hours prior to his death (11:54 a.m.).

¶ 22    Dr. Ng further testified that alcohol is a central nervous system depressant that affects people differently. Typically, an individual with a blood alcohol concentration over 0.200 would experience changes to their visual acuity, perception of objects, motor coordination, and judgment. A blood alcohol concentration of 0.203 would not cause an individual to pass out or become unconscious.

¶ 23    There is, however, a difference between a native drinker (one who drinks rarely) and a chronic drinker (one who drinks every day). Dr. Ng testified that the affect of alcohol on a chronic drinker, as opposed to a native drinker, is much less because chronic drinkers build up a tolerance. According to Dr. Ng, an individual's history and behavior with alcohol are "critical" for determining impairment. Dr. Ng admitted he did not know of the decedent's

history of alcohol consumption and indicated he did not have an opinion as to whether or not the decedent was impaired at the time of the accident because "you cannot just look at the alcohol reading and make that judgment."

¶ 24    Dr. Christopher Long, the current chief toxicologist at the medical examiner's office for the county of St. Louis, testified as an expert on Belfor's behalf. After reviewing the records from the Cook County medical examiner's office, the depositions of the medical examiner, Dr. Arnkumar, Ng, the police officer and paramedic, fire department and police department records, and the decedent's medical records regarding treatment for his hip and his shoulder, Dr. Long opined that the decedent's blood alcohol level at the time of his death was greater than 0.203. He believed that vitreous fluid alcohol level (0.283) was more accurate. Dr. Long also opined that there was Norco, a prescription opiate, in the decedent's system at the time of the accident. According to Dr. Long, Norco depresses several areas in the brain responsible for cognitive function and reaction time and makes a person groggy so they do not feel pain as much. Dr. Long testified that a combination of a blood alcohol level over .2 and Norco could be fatal.

¶ 25    Dr. Long also testified regarding the affect of alcohol on the body. Specifically, Dr. Long testified that when an individual has a blood alcohol level of 0.203, one experiences double vision, loss of peripheral vision and color recognition, and loss of control over fine and gross motor skills. Dr. Long further opined that an individual's ability to control a bicycle would "without doubt" be impaired.

¶ 26    Dr. Long opined that the decedent's conduct in riding a bicycle across six lanes of traffic was a "very risky operation" that "shows lack of comprehension of what he was doing" and demonstrates "all classical signs and symptoms of intoxication." According to Dr. Long, attempting to "pop a wheelie" over a double curb "supports impairment because if you make a mistake, you are on a busy road, you can easily fall into the road, get run over."

¶ 27                    C. The History of the Condition of the Window

¶ 28    In addition to the testimony regarding the accident, the parties provided further testimony and evidence regarding the condition of the window the decedent fell through and Belfor's activities on the property.

¶ 29    Patricia Lynch, owner of the boutique, testified as follows. When she opened her business in May 2005, the plate glass windows adjacent to 95th Street and Lacrosse Avenue were replaced. In 2006, she noticed a very small hole in the window on the side of the building facing Lacrosse Avenue. She placed tape over the hole, but did not repair it. In her recollection, there was only one hole, which was the size of a "BB hole," in the window.

¶ 30    Lynch further testified that as a result of the November 2010 fire, her boutique suffered extensive smoke damage as well as damage caused by the fire department. Consequently, she never conducted business at that location again. In March 2011, she gave her key to the boutique to a Belfor employee and thereafter did not have access to the boutique.

¶ 31    Lynch did, however, return to the boutique on May 24, 2011, to retrieve flower pots that she had placed outside. She arrived at the boutique twice, first at 9 a.m. and then at 11:30 a.m. That day she observed two-foot to three-foot cracks in a "tree-like pattern" coming from the lower left side of the plate glass window adjacent to Lacrosse Avenue from her parked vehicle as well as from the sidewalk. She had not observed these cracks prior to May 24, 2011, and

testified they were not present prior to the fire on November 17, 2010. She was unaware of how the cracks in the window came into existence.

¶ 32    On cross-examination, Lynch testified that when she occupied the boutique, she was not concerned with the amount of pressure she applied to the windows when cleaning them. Lynch further testified that it was Karnezis who informed her of the "BB hole" in 2006, but she had no issue with the hole while she occupied the space. Karnezis, however, testified that he had no recollection of a conversation with Lynch regarding a hole in the Lacrosse Avenue window.

¶ 33    Karnezis testified that Belfor was hired to restore the interior of the property damaged by the November 2010 fire. Karnezis had no expectation that Belfor was going to perform any work on the boutique windows. Karnezis further testified that a second contract with Belfor was executed on March 21, 2011, which required Belfor to perform demolition and clean up of the property interior. The March 21, 2011, contract also did not require Belfor to "do anything with" the boutique windows. According to Karnezis, Belfor used a Bobcat to remove the waste after the wall between the boutique and an adjacent store was removed. After Belfor completed the interior demolition work and subsequent to the decedent's accident, a third phase of construction commenced, which required external changes to the property.

¶ 34    Regarding his access to the property, Karnezis testified that immediately after the fire, Belfor erected a fence around the property from Eva's Bridal Salon to the boutique. Karnezis testified that only Belfor's employees were allowed into the property and that he did not have a key to access the property. He further testified he was not allowed inside because he was not one of the laborers, but he did visit the property frequently between January 2011 and May 24, 2011.

¶ 35    Tim English, Belfor's project manager for the restoration project, testified that Belfor first commenced fire remediation services at the property on November 19, 2010. The fire mitigation work included "small scale cleaning, mopping up," whereas the construction work at the property involved the roof structure and structural steel. Their work also included boarding up portions of the property that had not been previously boarded up by Ace Boarding Company on November 17, 2010. According to English, some of the board up was done at the direction of the Village of Oak Lawn for aesthetic purposes.

¶ 36    According to English, Belfor and Karnezis entered into a second contract on March 21, 2011, which included work to be performed inside the boutique. Prior to performing any work, the boutique was tested for hazardous materials. The boutique tested positive for floor mastic and asbestos tile.[6] Thus, according to English, "the work that was done in Ms. Fantasia's was done not to disturb or make friable any of the materials that were in the building." English clarified on cross-examination that the floor tiles contained asbestos and that Belfor had made the decision not to use heavy equipment near the boutique due to the asbestos hazard. Belfor boarded up the front door to the boutique.

¶ 37    English further testified that a subcontractor, Robinette, was engaged to perform the demolition work on the property. English acknowledged that Robinette's proposal indicated that, " 'The bid is based on using diesel and air powered equipment as well as cutting torches to assist in the demolition activities ***.' " English understood that to mean that Robinette would be using Bobcats as part of the demolition project. English clarified that the demolition work

---

[6]English testified that mastic is a glue that adheres tile to the floor and contains asbestos.

was more extensive in the areas of the property with the most fire damage. According to English, Robinette was aware of the presence of asbestos in the boutique.

¶ 38    English also acknowledged that on April 26, 2011, Belfor met with Robinette at the property to discuss demolition of the remainder of the building, including the boutique's windows and parapet wall along Lacrosse Avenue. This portion of the project, however, had not yet been approved by the Village of Oak Lawn. Accordingly, the meeting was merely to create a proposal for the rebuilding of the property. English did not recall examining the window on that day.

¶ 39    English further testified that Belfor completed its work pursuant to the second contract on April 26, 2011, and was off of the job site, but had left some equipment inside the property and the fence remained intact. Belfor then returned to the site on May 24, 2011, after the accident and removed some of its equipment.

¶ 40    Regarding the condition of the windows at the property, English testified he walked by the window at issue 30 times and never viewed a BB hole in the window. English testified that had he observed a BB hole, he would have notified Karnezis and either boarded up the window or secured it. English further testified that Belfor complied with the general safety provisions of the International Building Code.

¶ 41    Regarding Belfor's control over the property, English testified that prior to May 24, 2011, Belfor had erected a fence on Lacrosse Avenue that "went out approximately 24 feet and then headed east, made a right angle and headed east." Belfor directed where the fencing was placed and later modified the fence by bolting it into the asphalt for security and safety. On March 30, 2011, the fence was extended to the southwest corner of the property where the boutique was located. That same day, Belfor banners were placed on the fence along with three "no trespassing" signs. According to English, "It's incumbent upon us to put those [no trespassing] signs up. So if anyone is inside, a policeman drives by, they know they are trespassing if they are not a Belfor employee." The fence also had a gate with a chain lock and a lockbox. According to English, a lockbox is a box that holds keys that are accessible by punching in a four-digit code. The lockbox belonged to Belfor and keys to the property were placed in the lockbox. English further testified that Karnezis was on site every day and "had full access to the building" in that he "had the code to the lockbox, and he also had his own master keys."

¶ 42    Henry Manalli, the general manager of Belfor's Downers Grove office, testified that had the BB hole been brought to his attention, he would have left the window "as is" and not boarded it up. According to Manalli, the BB hole had a minimal impact on the strength of the glass. He further testified that no cracks were observed while Belfor was working on the job site. He also testified, however, that had he observed a crack in the window that began in the bottom corner, Belfor "most likely would have boarded it up." This is because "a crack tends to be something that may be a live crack. *** It could get worse, so we wouldn't leave that in place. We would board it up and do the safe thing." According to Manalli, the safety inspector on site did not observe any cracks in the glass during the April demolition.

¶ 43    Manalli acknowledged that, at a minimum, three months prior to the accident Belfor was aware of plans that the window through which the decedent fell was going to be removed in the near future. Manalli clarified that the window was not being removed because it was damaged, but because the building was being redesigned.

¶ 44                                    D. Plaintiff's Expert Testimony

¶ 45        Plaintiff provided the following expert testimony in support of its case.

¶ 46        Mark Meshulam testified as an expert on behalf of plaintiff in the field of building engineering with a specialty in windows and glass. Meshulam based his testimony on his review of the photographic evidence, the records of Belfor, and the deposition testimony. Meshulam further testified that he also visited the site and "performed some computerized calculations on glass strength" in coming to his opinions in this matter.

¶ 47        Meshulam testified that plate glass breaks more easily than tempered glass and, when it does, it tends to break in very large, sharp shards. Meshulam further testified that plate glass, when hit with a "BB," has what is called a conchoidal fracture. In such a fracture, where the BB first impacts the glass there is a relatively small circular hole with a larger hole on the opposite side in a cone-shaped formation. Meshulam testified that upon his examination of a photograph he observed two BB holes in the plate glass window, each covered with two pieces of tape.

¶ 48        Meshulam also testified that a photograph, taken from the interior of the boutique and looking out of the broken window, demonstrated "a deformation on the aluminum storefront framing where it appears that they are pushed towards the exterior of the building."[7] The photograph further indicated "an indentation in the glazing gasket and then beyond that, to the left, is what appears to be the origin point of the two cracks that we discussed that were reported by Patricia Lynch." Meshulam opined that the cracks were caused by a "strong outward force [that] was applied in those areas."

¶ 49        Meshulam further opined that "it would take very minimal pressure or force to cause the glass to fail in the way that it did when Mr. Racky fell through it." Meshulam based his opinion on his extensive experience observing and creating glass breakage under a variety of different conditions and a knowledge of how the glass industry cuts glass. According to Meshulam, the glass industry cuts plate glass by placing a small scratch on the surface of the glass by a robot arm and then cracking the glass. The cut is done "very, very quickly, and very cleanly." Meshulam testified, "They don't cut at all. They simply scratch it and crack it."

¶ 50        Meshulam could not opine on the number of pounds of pressure it would take to cause the window to collapse in a manner similar to what occurred in this case because it would be "difficult, if not impossible, to replicate this break" in a test environment.

¶ 51        On cross-examination, Meshulam testified that he is neither a structural engineer nor an architect. He further testified that he did not perform any tests to formulate his opinions in this case. He also did not perform any calculations to determine the amount of force it would take to break a window of the same dimensions. Meshulam also testified he did not believe that the decedent's bicycle impacted the glass first. He did not consider the decedent's level of intoxication as a contributing variable. Meshulam did not review any photographs of the interior of the window prior to the date the one which demonstrated the damage was taken.

¶ 52        Dennis Puchalski, an expert in construction safety, testified as follows. After reviewing the depositions, contracts, photographs, accident investigation reports, job site documents, and progress logs, Puchalski opined that Belfor failed to act as a reasonably safe contractor given that it did not discover the BB hole or cracks, which would have been discovered by a

---

[7]This photograph along with many others were entered into evidence.

contractor during an inspection of the property. Puchalski also testified that "recognized standards" require one to "continuously inspect in demolition because it's the most dynamic process, and there can be unforeseen consequences." According to Puchalski, a taped-up BB hole and cracks in a window are something a contractor would discover if he or she were undertaking a reasonable inspection of the property unless they were in a hard-to-see place. Puchalski also testified that the construction and demolition work inside the property could be "a likely cause of cracks" in the window, but admitted this opinion was based on the circumstances that occur during an active demolition at a construction site.

¶ 53       Puchalski further opined that Belfor exercised control over the job site in the following ways: (1) employing a site supervisor; (2) erecting a fence with a gate; and (3) controlling access to the property. According to Puchalski, a company erects a fence to control and restrict access because it does not want nonconstruction personnel coming into the construction site. The boutique was a part of the job site because Belfor was performing clean-up and demolition inside.

¶ 54       On cross-examination, Puchalski testified that while Belfor was initially retained as a fire restoration contractor, that changed with the March 21, 2011, contract, and it became a general contractor for the demolition and clean-up of the property. Puchalski, however, could not say whether there was still any fire-related damage in the property in March or April 2011 because he did not inspect it.

¶ 55                              E. Defendant's Expert Testimony

¶ 56       Andrew Nieto, an expert retained by Belfor to provide his opinions regarding the safety at this particular job site, testified as follows. In preparing for his testimony, Nieto testified he reviewed the depositions, exhibits, photographs, Belfor records, and the decedent's records. Based on photographs he viewed of the plate glass windows at issue from early 2011, Nieto opined that there was "nothing that *** jumps out at me as a hazard." Nieto testified he would typically examine the condition of the window to determine if there are large cracks that would compromise the stability of the window, and from the photographs, it appeared the glazing was secure.

¶ 57       Nieto further opined that he would not have recommended that the window be boarded up because the BB hole did not create an "inherent instability in the window" as there was no "radial cracking." In reference to Lynch's testimony about the cracks, Nieto testified that had he viewed those cracks, he would not have found they presented a hazard. According to Nieto, "Just because of one perforation [BB hole] and some small cracks, to me it doesn't affect the inherent stability of the window, keeping in mind that the window had been in place for five or six years, that the perforation had been there for five years, had gone through five Chicago winters, had been cleaned on the exterior by professional window washers, on the interior by the tenant Miss Lynch." Based on those facts, Nieto opined that "the window was stable."

¶ 58       Regarding fencing, Nieto testified that fencing is typically installed to keep unauthorized personnel out of the job site and to maintain site security, "That's its main role is to keep people out." Nieto further testified that on April 27, 2011, Belfor left the property in a secured manner and, in his opinion, had no obligation to inspect the site thereafter.

¶ 59                                    F. Lindsay Anderson

¶ 60        Lindsay Anderson, a licensed architect and structural engineer, testified as an expert regarding his opinions about the strength of the plate glass window and the series of events that lead up to the decedent falling through it. Anderson based his opinions on his review of the depositions, police reports, building code requirements, measurements of the glass window, calculations performed by hand and with the assistance of a computer, and his observations of the bicycle.

¶ 61        Anderson ultimately opined that the decedent was moving forward at a rate of speed of 6.3 miles per hour when his bicycle "climbed" the parapet wall and the left handlebar impacted the plate glass window approximately 45 inches above the sidewalk. According to Anderson, it was the force of this impact alone that caused the glass to fragment; neither the BB hole nor the cracks weakened the glass and caused it to fragment.

¶ 62        Anderson further testified that the point of impact was "a couple of inches at the most" and was thus inconsistent with the size of a hand. Anderson acknowledged that the point of impact was seven inches above where the bicycle's handlebars would have been, hence his opinion that the bicycle effectively "climbed" the parapet wall. In addition, Anderson testified the fact the decedent was discovered 2½ feet inside the boutique supported his conclusion that the decedent approached the window at 6.3 miles per hour.

¶ 63        Regarding the strength of the window, Anderson testified he performed an analysis of the window using a computer program. According to that analysis, the window, with one BB hole (as depicted in the photographs), was able to withstand 20.9 pounds per square foot of pressure. This analysis was further supported by the fact the window had withstood windstorms in 2008 and 2010, which would have exerted significant pressure on the window. In fact, the windstorm in 2008 had caused the window directly next to the one at issue in this case to fracture. Anderson ultimately opined that the glass failed because the decedent's handlebar hit the glass with a force of at least 110 pounds in a concentrated manner.


¶ 64                              G. The Decedent's Family History

¶ 65        All four of the decedent's adult children (Sean, Meghan, Matthew, and Molly) testified regarding the relationship they had with their father and their personal losses resulting from his death. The children each testified regarding their happy childhoods with their father coaching various sports teams, taking them on camping trips, and being a supporting and loving father. Following their parents' divorce in 1998, they began seeing their father less frequently. From 2004 until 2010, the children lost contact with their father. Many of the older children were aware that their father was an alcoholic.

¶ 66        On July 21, 2010, Sean recommenced a relationship with his father. During this time Matthew also reconnected with his father. For the next six months Sean and Matthew spoke on the phone with their father and then in November 2010 decided to meet him at a local bar. Sean and Matthew continued to speak with his dad periodically over the phone. In March 2011, the decedent attended Matthew's ultimate Frisbee tournament. The frequency of the phone calls between the decedent and his sons increased over time.

¶ 67        Although they were aware their brothers were communicating with their father, Meghan and Molly did not reconnect with their father prior to his death. Both daughters testified they did not feel as though they were ready to reestablish a relationship with him at that time.

¶ 68    Each of the Racky children expressed anger and guilt over their father's death. Sean testified his anger over his father's death has increased over time. Meghan testified regarding the deep guilt she felt that she did not reconcile with her father when her brothers did. She stated that she believed she would have reconciled with her father had he have lived. Meghan also acknowledged that she met with a counselor regarding the grief she felt over her father's death.

¶ 69    Patricia Harthun, a licensed clinical professional counselor, testified she counseled Meghan regarding the grief she had over her father two months after his death. After a break in counseling, in 2014, she diagnosed Meghan with complicated grief. Harthun explained that a sudden death increases the likelihood of having complicated grief because there is no opportunity to say good-bye and that complicated grief cannot be "cured" and is likely to "flare up throughout the person's life." Harthun testified she did not counsel the other Racky children, but did review their depositions. Based on that review, she believes that factors are present that can increase the likelihood of them having a complicated grief reaction.

¶ 70    Dr. Andrew Kulik, a psychologist, testified as an expert in the field of psychiatry on behalf of defendant. Kulik testified he reviewed the depositions of the Racky children, the depositions, the arrest and incarceration records for the decedent as well as his treatment record, and the records in this case. Dr. Kulik opined that the decedent was an alcoholic. He also opined that the decedent did not have "any significant relationship over the period of 10 to 20 years." Dr. Kulik further opined that had the decedent lived, he "might have seen [his children] every few years or spoken to them here or there, but I don't think there was any evidence to indicate that his relationship with them would have changed dramatically." Dr. Kulik expressed no opinion regarding any diagnosis the Racky children could have.

¶ 71                                    H. The Trial Court's Ruling

¶ 72    Following the trial, the trial court entered a 56-page written order, finding in favor of plaintiff and awarding $1.875 million in damages after the award was reduced by 25% to account for the trial court's additional finding that the decedent was 25% contributorily negligent.

¶ 73    The trial court made the following findings of fact regarding the accident itself. On May 24, 2011, the decedent was riding his bicycle south across 95th Street at the intersection of Lacrosse Avenue in Oak Lawn. Along Lacrosse Avenue was the property, which had two large, plate glass windows. One of those windows contained two BB holes and "a multitude of cracks emanating from the lower left corner of the window out two to three feet in height and two to two-and-a-half feet in width." As the decedent finished crossing 95th Street, he lifted his front bicycle wheel off of the ground and jumped his bicycle over a 12-inch curb at the corner of 95th Street and Lacrosse Avenue. Once on the sidewalk, the bicycle slowed and wobbled as he lost momentum. The decedent continued traveling south on the sidewalk, parallel to the building. The decedent then extended his left arm in an apparent attempt for balance, lightly touched the window, and the window collapsed. The trial court found, based on Rodriguez's demonstration during his testimony, that the decedent did not fully extend his left arm and that the height of his arm was estimated at "8-12 inches from its original position" above the bicycle handlebars.

¶ 74    The decedent then fell through the storefront window, suffering a deep laceration that almost entirely severed his left leg. The decedent's legs were draped over the broken glass,

partially hanging outside the front of the storefront with his bicycle underneath him. Despite the quick attention of two bystanders, he died as a result of the loss of blood sustained in this incident.

¶ 75    As to the condition of the window, the trial court found, based on Meshulam's testimony and the photographic evidence, that there were two BB holes. The trial court further found that a photograph taken after the accident by the Oak Lawn police department from the interior of the boutique demonstrated that a force was applied from the interior of the boutique in an outward direction that caused a deformation of the black rubber window gasket immediately adjacent to the area from where the cracks emanated. The photograph, as well as Meshulam's testimony, indicated that the aluminum window sill had been pushed outward and upward in the lower corner of the interior of the window that had collapsed. The trial court determined, based on this evidence, that the damage inside the boutique was exactly at the location of the cracks observed in the police photographs and testified to by Lynch. Based on Manalli's testimony, the trial court also found that "Belfor was well aware that the area where [the] plate glass was located and [the decedent] fell through would eventually be removed and not repaired."

¶ 76    Regarding the credibility of the witnesses, the trial court found as follows. The trial court found Rodriguez's testimony to be credible in its description of the decedent's bicycle riding, his jump over the curb, and the accident and his observations thereafter. The trial court also found Lynch to be a credible witness and noted that the fact she only recalled one BB hole does not diminish her testimony or impugn her credibility. Karnezis was also found to be a credible witness "as is his testimony regarding his inability to access the property that was secured by Belfor."

¶ 77    The trial court, however, did not find English to be a credible witness. The court noted that while English "testified that no work could be done in the Miss Fantasia space because of asbestos found in the floor tiles there and all of the work would have to be done by hand," it is "contradicted by photographic evidence in this case and the contract entered into between Belfor and [Robinette]." The trial court further found that English's testimony that Belfor was no longer at the property at the time of the accident was "directly contradicted by the fact that Belfor still had in place their security fence that allowed access only by Belfor personnel or their subcontractor and that immediately after [the decedent's] accident, Mr. Belfor [*sic*] arrived at the property and ordered subordinates to remove Belfor equipment from the property in the hours afterwards." Similarly, the trial court found Manalli not to be credible in his testimony that Belfor had " 'pulled off of the site' " at the time of the decedent's accident.

¶ 78    The trial court also did not find Anderson's explanation as to how the window collapsed to be supported by the evidence in the case. Specifically, the court noted that Anderson agreed that Rodriguez did not observe the bicycle handlebar rising seven inches or the bicycle climbing up the wall. In addition, Anderson's testimony that the decedent was traveling at an angle to the window was not supported by the eyewitness testimony. The trial court found Anderson's testimony that the large and substantial cracks in the window did not contribute to the glass breaking to be "implausible at best." The trial court concluded that the testimony of plaintiff's expert, Meshulam, was more credible than Anderson's and was supported by the eyewitness testimony and photographic evidence.

¶ 79    The trial court ultimately found that plaintiff proved its premises liability claim based on section 343 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 343

(1965)) by a preponderance of the evidence. To be liable under the Restatement, Belfor must be a "possessor of land." The trial court found that the evidence at trial established Belfor was a possessor of land and knew or should have known of the dangerous and hazardous condition the window posed. The court determined Belfor had possession of the property based on the fact that (1) it had secured the property at all access points, (2) it placed a fence surrounding the back portion of the property, (3) the fence was bolted to the pavement, (4) Karnezis did not have access to the property, (5) its possession and control included the boutique, (6) only it had a key to the gate and the code to the lockbox, (7) the front door of the boutique was boarded up, (8) it installed three "no trespassing" signs that were intended to keep the public out of the construction site, (9) it had possession of Lynch's key to the boutique and had exclusive possession of that space, and (10) there was no evidence that Belfor turned the property back over to Karnezis prior to the accident. The trial court ultimately concluded that the owners of the property surrendered possession and control of the property to Belfor.

¶ 80    Additionally, the trial court found that the window the decedent fell through presented an unreasonable risk of harm and was in a dangerous and hazardous condition based on the holes in the window and the three cracks as described by Lynch. The court further found that Belfor knew or should have known of the condition and risks presented by the window. Belfor was on the site six months prior to the accident and had complete control and possession of the property the two months before the accident. This conclusion was based on the testimony that Belfor boarded up additional areas as required and had more than enough opportunity to discover the BB holes.

¶ 81    The trial court also found that, even if the BB holes did not create a dangerous condition, plaintiff proved through circumstantial evidence that Belfor or its subcontractor caused the large cracks in the window and, as such, Belfor had actual knowledge of the cracks. These cracks posed a danger to the public, even at the lightest touch, and Belfor did nothing to abate or protect the public by boarding the window or blocking the sidewalk at that location as they had done at the rear of the building. Further, the court found these cracks were caused as a result of the demolition which Belfor agreed in writing to accomplish, which was subcontracted to Robinette, and was supervised daily by Belfor's employee at the scene. This conclusion was supported by the photographic evidence that "the demolition caused a forceful hit to the interior of the building at the location of the cracks," the flooring had been removed, the interior walls had been stripped of their covering, and the lightbulbs that were previously visible around the windows had been removed. This evidence—combined with the description of the work to be performed in Robinette's proposal for interior demolition, as well as the description of the damage to the western portion of the property—established direct and circumstantial evidence to support the fact that demolition occurred inside the boutique and that this demolition was the cause of the cracks in the window.

¶ 82    The court also found that Belfor could reasonably expect someone like the decedent would not discover or realize the danger and would fail to protect himself against it. The court concluded that Belfor was negligent.

¶ 83    As for the issue of damages, in the survival action, the trial court found that the decedent suffered a "gruesome and unnecessary death" and noted that it would not "discount the pain for its brevity given the intensity by which it must have been experienced." Specifically, the court found that the decedent experienced conscious pain and suffering that lasted a "few minutes from the time of the accident through the period which Ricardo Rodriguez has testified to

- 14 -

observing [the decedent]." The court also relied on the testimonies of Rodriguez, Dr. Schwab, and Dr. Bauer to support its conclusion. The court further acknowledged that alcohol and Norco "in a person's system can have pain reducing effects," but despite this evidence, concluded the decedent experienced conscious pain and suffering. The court awarded plaintiff $1 million.

¶ 84 In regards to the wrongful death action, the trial court acknowledged that there was a period of time in which the decedent did not have a relationship with his children, but that recent history indicated that the decedent's sons have experienced a substantial loss which the law presumes based upon their resumption of a father and son relationship. The court further found that all of the Racky children testified credibility that their loss is worse today than it was when it began and that the loss of their father deeply affected them and that they suffered from complicated grief. The court further acknowledged that while the Racky daughters had not yet renewed a relationship with their father, they had intended to do so. The trial court awarded plaintiff $1.5 million for the survival count and $1 million for the wrongful death count.

¶ 85 However, the trial court did conclude that the decedent was guilty of contributory negligence based on his failure to abide by the local ordinance that disallowed bicycle riding on sidewalks and riding his bicycle across six lanes of traffic where there was no traffic signal. The court also took the decedent's intoxication and impairment into consideration and acknowledged it may have clouded his judgment. The court ultimately found the decedent to be 25% negligent and reduced the verdict accordingly.

¶ 86 This appeal followed.

¶ 87 I. ANALYSIS

¶ 88 A. Propriety of Judgment

¶ 89 Belfor first argues that the trial court erred in concluding it had a duty of care under a premises liability theory, pursuant to section 343 of the Restatement (Second) of Torts. Restatement (Second) of Torts § 343 (1965). Belfor challenges this duty on three grounds. First, it argues that it was not a possessor of the boutique, or the property for that matter, within the meaning of section 343. Second, Belfor contends that even if it was a possessor of the boutique and the decedent was an invitee, it still owed the decedent no duty because the plate glass window was an open and obvious danger. Finally, Belfor asserts that, regardless of the issue of possession, its duties were strictly limited by the scope of the contract, which did not impose any responsibility for the windows. We consider each argument in turn.

¶ 90 Initially, we set forth our standard of review. The customary principles of ordinary negligence are applied to determine the liability of parties in possession or control of a premises upon which an individual is injured. *Clifford v. Wharton Business Group, L.L.C.*, 353 Ill. App. 3d 34, 40 (2004); *Smith v. Holmes*, 239 Ill. App. 3d 184, 197 (1992). "In order to recover in an action for negligence, a plaintiff must establish the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury to the plaintiff proximately caused by the breach." *Sameer v. Butt*, 343 Ill. App. 3d 78, 85 (2003). "The question of the existence of a duty is a question of law and, in determining whether a duty exists, the trial court considers whether a relationship existed between the parties that imposed a legal obligation upon one party for the benefit of the other party." *Id.* "In considering whether a duty exists in a particular case, a court must weigh the foreseeability that defendant's conduct will result in injury to another and the likelihood of an injury occurring, against the burden to defendant of

- 15 -

imposing a duty, and the consequences of imposing this burden." *Ziemba v. Mierzwa*, 142 Ill. 2d 42, 47 (1991). "Where no duty exists, the plaintiff cannot recover." *Clifford*, 353 Ill. App. 3d at 40.

¶ 91 While the question of whether Belfor owed a duty to plaintiff is a legal one that we review *de novo*, since the matter proceeded to a bench trial, in this instance it is also based on the trial court's findings of facts. See *Rucker v. Rucker*, 2014 IL App (1st) 132834, ¶ 39 (breach of duty and causation constitute findings of fact). We will not reverse a trial court's findings of fact unless they are against the manifest weight of the evidence. *Id.*; see *Shulte v. Flowers*, 2013 IL App (4th) 120132, ¶ 24 (the standard of review depends on whether the underlying issue is factual or legal); see also *Price v. Phillip Morris, Inc.*, 219 Ill. 2d 182, 236 (2005) (implying that where the trial court's evaluations of credibility of witnesses or conflicting testimony are at issue, the standard of review is deferential).

¶ 92                                          1. Possessor of Land

¶ 93 Belfor first asserts that it was not a possessor of the property at the time of the decedent's accident. Section 343 of the Restatement sets forth the circumstances under which "[a] possessor of land is subject to liability for physical harm" to persons on his land. Restatement (Second) of Torts § 343 (1965). Section 343 provides:

> "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger." Restatement (Second) of Torts § 343, at 215-16 (1965).

¶ 94 "The term 'possessor' with respect to possession of land is defined in the Restatement as 'a person who is in occupation of the land with intent to control it.' " *Madden v. F.H. Paschen/S.N. Nielson, Inc.*, 395 Ill. App. 3d 362, 375 (2009) (quoting Restatement (Second) of Torts § 328E, at 170 (1965)). "The two requirements under that subsection are occupation and intent to control the *land*, as opposed to the activities or individuals thereon." (Emphasis added.) *O'Connell v. Turner Construction Co.*, 409 Ill. App. 3d 819, 824 (2011). "The concept of 'control' is closely tied with the ability to exclude people from the use of a piece of property or to direct how that property is to be used." *Williams v. Sebert Landscape Co.*, 407 Ill. App. 3d 753, 756 (2011). "Only the party in control of the premises can be held liable for a defective or dangerous condition on the premises." *Hilgart v. 210 Mittel Drive Partnership*, 2012 IL App (2d) 110943, ¶ 38. This duty, however, does not extend to risks created by "open and obvious" conditions. *Joyce v. Mastri*, 371 Ill. App. 3d 64, 79 (2007).

¶ 95 Belfor maintains that it was always subject to the authority of the owner, Karnezis, and the Village of Oak Lawn. Thus, it did not have the authority to freely control the property. Belfor notes that both Karnezis and the Village of Oak Lawn were "actively engaged in decision-making related to the property at all times from the very start." Belfor does not reference any specific evidence regarding Karnezis's control over the property in its argument, but points to the Village of Oak Lawn's initial order to board up the property as an example of

its control over the premises. Belfor further argues that the circuit court ignored the fact that the property was reopened to the public within a month of the fire, as well as the fact that Belfor was not performing any work at the property at the time of the accident.

¶ 96    Belfor contends that the case of *O'Connell* is directly applicable to the issue at bar. We disagree. We initially observe that the procedural posture of *O'Connell* differs significantly with the procedural posture of this case. *O'Connell* was decided on a motion for summary judgment, whereas, in the case at bar, the matter went to trial, and a verdict was entered in favor of plaintiff. See *O'Connell*, 409 Ill. App. 3d at 820. Due to the fact the *O'Connell* court was considering the matter on a motion for summary judgment, it primarily examined plaintiff's allegations and arguments. *Id.* at 825. In contrast, because the matter before us proceeded to a trial, we have all of the pertinent facts to consider whether or not Belfor was in possession of the property at the time of the accident.

¶ 97    These differences aside, *O'Connell* is also factually distinguishable. In *O'Connell*, the plaintiff made no allegations that the defendant "could exclude anyone from the premises or that it could even alter what was built where" and instead argued that the defendant " 'had general responsibility for safety on the project.' " *Id.* The reviewing court held that these allegations were insufficient to survive a motion for summary judgment where the plaintiff did not "tie this alleged authority to a right or intent to control the premises, as opposed to the individuals or activities thereon." *Id.* Moreover, the reviewing court observed that, "It is apparent here, *and plaintiff does not claim otherwise*, that whatever authority [the defendant] exercised at the construction site, it did so subject to that of the School District." (Emphasis added.) *Id.* at 826. The reviewing court further noted that the plaintiff failed to provide "any evidence here indicating that [the defendant] controlled or intended to control the land at issue." *Id.* In contrast, plaintiff here has asserted and presented facts to support its allegations that Belfor exercised control and dominion over the property.

¶ 98    We conclude that the evidence adduced here supports the trial court's conclusion that Belfor was a possessor of the property. As relayed in the trial court's comprehensive written order, Belfor exercised exclusive control and dominion over the property. The trial court based this determination on the following findings of fact: (1) Belfor had secured the property at all access points, (2) Belfor placed a fence surrounding the back portion of the property, (3) the fence was bolted to the pavement, (4) Karnezis did not have access to the property, (5) its possession and control included the boutique, (6) only it had a key to the gate and the code to the lockbox, (7) the front door of the boutique was boarded up, (8) Belfor installed three "no trespassing" signs, which were intended to keep the public out of the construction site, (9) Belfor had possession of Lynch's key to the boutique and had exclusive possession of that space, and (10) there was no evidence that Belfor turned the property over to Karnezis prior to the accident. In addition, Belfor kept equipment and materials at the property during the month of May. Testimony from English established that this property was removed the same day as the incident, and even then, only after Belfor learned of the accident. We cannot say that these findings are against the manifest weight of the evidence and thus conclude that Belfor was a possessor of the property.

¶ 99    Our determination that the trial court did not err in finding Belfor possessed the property does not end our inquiry into whether Belfor had a duty towards the decedent. Under section 343 of the Restatement, "there is no liability for landowners for dangerous or defective conditions on the premises in the absence of the landowner's actual or constructive

- 17 -

knowledge." *Tomczak v. Planetsphere, Inc.*, 315 Ill. App. 3d 1033, 1038 (2000); *Hanna v. Creative Designers, Inc.*, 2016 IL App (1st) 143727, ¶ 34. This section of the Restatement falls directly in line with the general negligence principle that, "[t]he general contractor's knowledge, actual or constructive, of *** a dangerous condition is a precondition to direct liability." *Diaz v. Legat Architects, Inc.*, 397 Ill. App. 3d 13, 35 (2009).

¶ 100    Belfor maintains that it cannot be charged with having constructive knowledge of the dangerous condition of the window. Generally, if a plaintiff is relying on proof of constructive notice, he or she must establish that the dangerous condition existed for a sufficient time or was so conspicuous that the defendant should have discovered the condition through the exercise of reasonable care. See *Smolek v. K.W. Landscaping*, 266 Ill. App. 3d 226, 228-29 (1994) (a hole that led to injury was so inconspicuous that one could not be charged with the knowledge of its existence). Whether a defendant is deemed to have constructive notice of the existence of a dangerous condition on the property is a question of fact. *Id.* at 229. "This court will not disturb a trial court's finding and substitute its own opinion unless the finding is against the manifest weight of the evidence. Especially where the evidence is contradictory, the trial court is in a superior position to weigh the evidence and determine the preponderance thereof." *Dale v. Luhr Bros., Inc.*, 158 Ill. App. 3d 402, 409 (1987).

¶ 101    First, we must consider whether the trial court erred when it determined that the boutique plate glass window constituted a dangerous condition. Belfor argues that the trial court's determination that a dangerous condition existed was against the manifest weight of the evidence where it "ignored" or "mischaracterized" the testimony offered by Anderson and Rodriguez. Belfor notes that Anderson's testimony utilized computer generated analysis and mathematical computations demonstrating that the plate glass was strong enough to withstand a light touch and that the break in the glass was consistent with an impact from a bicycle handlebar. Belfor maintains that the trial court's disregard of Anderson's testimony, in the absence of any opposing scientific testing, was arbitrary and warrants reversal, particularly where plaintiff's expert testimony was based on mere speculation. In addition, Belfor observes that the trial court did not consider Rodriguez's testimony during cross examination that his hand was "all the way up" (in contrast to 8 to 12 inches above the handle bars) and that Rodriguez admitted he did not know with what force the decedent touched the glass.

¶ 102    We disagree with Belfor's contention that the trial court disregarded or ignored certain testimony as to whether the plate glass window was in a dangerous condition. The trial court's thorough and well-reasoned written order demonstrates that the trial court thoughtfully considered all of the testimony presented and weighed the credibility of the witnesses prior to making its ultimate determinations. Although Belfor asserts that Anderson's testimony is inherently more reliable because he presented "unrefuted scientific analysis and calculations," as the trial court noted, Anderson did not perform computerized testing to discover what would happen to the glass "if there were two BB holes and three cracks, or only one BB hole and three cracks emanating 2-3 feet in a tree like pattern." The trial court further found that Anderson's testimony "that the large and substantial cracks in the window did not contribute to the glass breaking is implausible at best" and was "completely opposite to the eye witness testimony in this case." The trial court also found that Anderson's explanation for how the bicycle handlebar impacted the window at a much higher height was not supported by the evidence and ultimately concluded that Meshulam's testimony was more credible and supported by the

- 18 -

evidence. See *Greene v. City of Chicago*, 48 Ill. App. 3d 502, 506 (1976) (the trial court is in a better position to assess the credibility of the witnesses and to weigh the conflicts in evidence).

¶ 103    Additionally, our review of the record reveals that Meshulam's opinion testimony did not amount to mere speculation.[8] See *DiCosola v. Bowman*, 342 Ill. App. 3d 530, 538 (2003) ("Opinion testimony that is purely speculative in nature and based on guess, surmise or conjecture is inadmissible and is tantamount to no evidence at all."). We observe that the trial court correctly noted in its written order that, contrary to Belfor's argument, Meshulam did not testify as to the actual cause of the cracks in the window, only that the cracks in the lower corner were consistent with an interior impact that was, in turn, consistent with the interior demolition undertaken by Robinette and Belfor. Indeed, Meshulam testified—based on his evaluation of the photographic evidence, documents, and testimony—that it would take very little pressure to cause the window to collapse. This slight pressure is consistent with the light touch described by Rodriguez.

¶ 104    Belfor further asserts that the trial court disregarded the fact that Rodriguez's testimony as to the location where the decedent placed his hand on the window was either contradictory or impeached during cross-examination. Belfor maintains that Rodriguez was impeached based on (1) his prior statement to Officer Quinn that he observed the decedent "crash" through the window and (2) his testimony that he observed the decedent's left arm extended "all the way up," not 8 to 12 inches off of the handlebars as he had previously testified.

¶ 105    A witness may be impeached by prior inconsistent statements, whether directly or indirectly contrary to present testimony. *Spenner v. Jenkins Party Liquors, Inc.*, 111 Ill. App. 2d 116, 120 (1969). However, the inconsistencies must be great enough that material facts are actually contravened. *Goldstein v. Hertz Corp.*, 16 Ill. App. 3d 89, 97 (1973). Another mode of impeachment is that the witness on a prior occasion omitted to testify as to an important fact or circumstance. *Spenner*, 111 Ill. App. 2d at 120.

¶ 106    In regards to Rodriguez's statement to Officer Quinn, Rodriguez testified he did not recall informing the officer that the decedent crashed through the window. In turn, Officer Quinn testified that he believed the words "crashed" and "fell" had the same meaning to him. Based on this testimony, the purported inconsistencies between Rodriguez's statement to Officer Quinn and his testimony at trial was not significant enough that this material fact was actually contravened. See *Goldstein*, 16 Ill. App. 3d at 97.

¶ 107    As for Rodriguez's testimony regarding the placement of the decedent's hand on the window, our review of the record indicates that the trial court was diligent in narrating the gestures of the witness and counsel during this testimony. Even so, it is apparent that during this line of questioning Rodriguez and counsel were making gestures as they were testifying. As a court of review, we only have the "cold record" and the trial court's findings to rely upon. Thus, it is axiomatic that the trial judge has the opportunity to assess the credibility of witnesses and weigh the evidence and is thus in a better position than an appellate court faced

_____

[8]We observe that within the context of this argument, Belfor asserts that the trial court improperly denied its motion to bar Meshulam's opinions that were not based on any testing. Belfor, however, does not set forth a standard of review on this issue or even argue that the trial court abused its discretion when it denied its motion *in limine* regarding Meshulam's testimony. In fact, Belfor cites no case law in support of this cursory argument. Accordingly, we consider the issue to be forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016).

with a cold record. See *In re Estate of Muhammad*, 123 Ill. App. 3d 756, 761-62 (1984). Accordingly, a reviewing court will not disturb the trial court's determination of credibility because the trial court has a superior vantage point, which cannot be reproduced from the cold record, to observe and judge the witnesses' demeanor and credibility. See *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991).

¶ 108    That being said, the court consistently described Rodriguez's gestures as his left arm being extended and his hand placed on the window 8 to 12 inches above the handlebars. This occurred both on direct and cross-examination. We find it disingenuous that Belfor argues on appeal that Rodriguez changed his testimony from 8 to 12 inches above the handlebars to "all the way up" where the transcript of the cross-examination reveals that prior to so answering, Belfor's counsel was asking questions about the decedent putting his hand "straight out *** like a Heisman Trophy almost" and gesturing with his elbow "locked straight with his arm extended all the way to his left." The testimony was then as follows:

"Q. When Mr. Racky touched the glass, did you see him put his arm straight *out*? And again, I'm showing my arm straight out with my palm up and my elbow locked all the way out.

A. Yes.

Q. So his hand wasn't just a few inches away from the handlebar. It was all the way up?

A. I'll say it was all the way up.

Q. And do you think he put his hand *out* to balance himself? That's what you think?

A. Yes." (Emphases added.)

The record demonstrates that prior to asking the question about whether his hand was "all the way up," counsel was inquiring whether the decedent's hand was "all the way out." This is consistent with counsel's gestures as described above. The follow-up question further demonstrated that Belfor's counsel was interested in whether or not the decedent's hand was "out."

¶ 109    In its written order, the trial court stated it "observed closely the manner in which Rodriguez extended his arm while seated in the witness chair demonstrating" and found that "Mr. Racky's arm was not fully extended and that only his hand came into contact with the plate glass window. The Court estimated the height of his arm as 8-12 inches from its original position on the bike handlebars." In light of the fact, we must review a cold record and the analysis of the cross-examination testimony as discussed above, we disagree with Belfor's suggestion that the trial court disregarded Rodriguez's cross-examination testimony and defer to the trial court's findings on this issue. See *In re Marriage of Lewis*, 188 Ill. App. 3d 142, 146 (1989) (declining to reject the trial court's findings where only a cold record was before the reviewing court). In sum, the case law is clear that we, as the reviewing court, cannot reweigh the testimony or substitute its own independent evaluation of witness credibility for that of the trial court. *Cook Electric Co. v. Kolodny*, 1 Ill. App. 3d 181, 183 (1971). Thus, to the extent that Belfor contests the trial court's findings that were premised on the witness's credibility, we decline to hold those findings were against the manifest weight of the evidence.

¶ 110    Second, the evidence established by a preponderance of the evidence that the plate glass window was in a dangerous condition. The evidence demonstrated that the window had at least one small hole and numerous cracks as described by Lynch, whom the trial court found to be

credible. It is undisputed that one of those small holes existed prior to November 2010 when Belfor commenced its fire remediation services and English testified that, had he observed the holes, he would have either boarded up or secured the window. While no Belfor agent represented that they observed the cracks testified to by Lynch, Manalli, a general manager for Belfor, testified that had he observed similar cracks in the window, Belfor "most likely would have boarded it up." This is because "a crack tends to be something that may be a live crack. *** It could get worse, so we wouldn't leave that in place. We would board it up and do the safe thing."

¶ 111    In addition, plaintiff's expert Meshulam opined that, due to the condition of the glass, it would take very minimal pressure or force to cause the glass to fail. Plaintiff's expert testimony also established that plate glass breaks more easily than tempered glass and when it does break, it does so in very large, sharp shards. While Meshulam could not opine on the number of pounds of pressure it would take to cause the window to collapse, he stated his lack of an opinion was due to the fact that it was "difficult, if not impossible, to replicate this break" in a test environment.

¶ 112    After considering all of the testimony, it is apparent that it is in some respects contradictory. The evidence, nevertheless, was sufficient that the trial court, as the trier of fact, could determine by a preponderance of the evidence that the plate glass window was in a dangerous condition and that the finding was not against the manifest weight of the evidence. See *Dale*, 158 Ill. App. 3d at 409. The trial court was required to weigh the evidence and, after observing the witnesses, the trial court determined their credibility and the weight to be attached to their testimony, taking into consideration all the relevant factors, including their interest, if any, in the subject matter. *Cook Electric Co.*, 1 Ill. App. 3d at 183. The testimony of an expert witness is not to be accepted as truth *per se*, but must be judged as to weight and credibility by the same rules applicable to other witnesses. *Morus v. Kapusta*, 339 Ill. App. 3d 483, 492 (2003); *Peet v. Dolese & Shepard Co.*, 41 Ill. App. 2d 358, 369 (1963). In that vein, the trier of fact is free to disregard an expert's opinion or conclusion of fact on the basis of credibility considerations. *Morus*, 339 Ill. App. 3d at 492. Accordingly, we cannot say an opposite conclusion is clearly evident or that the determination is palpably erroneous. Hence, the trial court's judgment is not against the manifest weight of the evidence.

¶ 113    Belfor next asserts that the trial court's finding that Belfor knew or should have known about the condition of the window is against the manifest weight of the evidence where the court improperly disregarded unimpeached testimony and incorrectly relied upon speculation. Specifically, Belfor argues that the trial court improperly disregarded English's testimony that work was performed in the boutique, namely, that the flooring and wall coverings were removed by hand because heavy equipment would cause asbestos fibers in the flooring to become airborne. Belfor further argues that the trial court engaged in "impermissible speculation that a [B]obcat must have cause the cracking of the window in question" where there was no evidence that a Bobcat was ever in the boutique.

¶ 114    We conclude the trial court's determination that Belfor knew or should have known the condition of the plate glass window is not against the manifest weight of the evidence. The evidence established that at the time of the accident Belfor had been in exclusive control of the property since March 21, 2011. Photographs taken around this time indicated that no cracks were present in the plate glass window adjacent to Lacrosse Avenue. Thereafter, Belfor subcontracted with Robinette for demolition of the interior of the property. This interior

demolition work was completed by April 26, 2011. Subsequently, on May 24, 2011, the day of the accident, Lynch testified that cracks in the plate glass window were visible from the parking lot. Although the evidence is not conclusive as to when the cracks appeared, the evidence did demonstrate that they were not present in March 2011, but were present on May 24, 2011, prior to the decedent's accident.

¶ 115    Meshulam also testified that the damage to the interior window frame was likely caused by a "strong outward force." In addition, the contract between Belfor and Robinette provided for the use of gas powered machinery, and Karnezis and English testified that Bobcats were used during this phase of remodeling. Photographs taken by the Oak Lawn police department after the decedent's accident also demonstrated the cracks, albeit not in their entirety due to the fragmentation of the glass after the accident. These photographs depicted the damage to the interior frame of the window in the exact location where the cracks originated. Based on this circumstantial evidence, it was proper for the trial court to find by a preponderance of the evidence that Belfor had the requisite knowledge of the dangerous condition and we cannot say that this determination was against the manifest weight of the evidence. See *Harding v. City of Highland Park*, 228 Ill. App. 3d 561, 571 (1992) (the jury was entitled to find that the defendant caused a dangerous condition based on circumstantial evidence).

¶ 116                    2. Window Defect an Open and Obvious Danger

¶ 117    Belfor further asserts that even if it is deemed a possessor of the property, the plate glass window was an open and obvious hazard that negated any duty it owed to the decedent. According to Belfor, using a large plate glass window to support one's falling body weight while riding a bicycle is such an open and obvious hazard. Belfor further contends that the decedent had reasonable alternatives such as riding his bicycle on the street as required by law or using his foot to balance rather than the window.

¶ 118    "In Illinois, the open and obvious doctrine is an exception to the general duty of care owed by a landowner." *Park v. Northeast Illinois Regional Commuter R.R. Corp.*, 2011 IL App (1st) 101283, ¶ 12 (citing Restatement (Second) of Torts § 343A(1) (1965), and *Sandoval v. City of Chicago*, 357 Ill. App. 3d 1023, 1028 (2005)).[9] The doctrine provides that parties who own, occupy, control, or maintain land are not required to foresee and protect against injuries from potentially dangerous conditions that are open and obvious. *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 447-48 (1996).

¶ 119    "Open and obvious" conditions include those wherein the condition and risk are apparent to and would be recognized by a reasonable person exercising ordinary perception, intelligence, and judgment in visiting an area. See *Bonner v. City of Chicago*, 334 Ill. App. 3d 481, 484 (2002). Thus, the determination of whether the condition is open and obvious

---

[9]We note that section 343A(1) of the Restatement indicates by its use of the language, "unless the possessor should anticipate the harm despite such knowledge or obviousness," there are two limited exceptions to the open and obvious danger rule, which may apply under certain circumstances when the possessor of land has reason to anticipate or expect that an injury will occur to an invitee, despite the open and obvious nature of the danger. Restatement (Second) of Torts § 343A & cmt. *f* (1965); *Ward v. K Mart Corp.*, 136 Ill. 2d 132, 148-50 (1990). The parties do not argue that either of the exceptions apply in this case. Accordingly, we decline to consider them in this appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016).

depends not on plaintiff's subjective knowledge but, rather, on the objective knowledge of a reasonable person confronted with the same condition. See *id.* This is because property owners are entitled to the expectation that those who enter upon their property will exercise reasonable care for their own safety. See *id.* at 485; accord *Bucheleres*, 171 Ill. 2d at 448 ("people are expected to appreciate and avoid obvious risks").

¶ 120     Whether a dangerous condition is open and obvious may present a question of fact. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 18 (citing *American National Bank & Trust Co. of Chicago v. National Advertising Co.*, 149 Ill. 2d 14, 27 (1992)). But where no dispute exists as to the physical nature of the condition, whether the dangerous condition is open and obvious is a question of law. *Id.* (citing *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 34). As the parties on appeal here have disputed the condition of the plate glass window and the matter went to trial, whether the plate glass window presented an open and obvious danger is a question of fact. *Duffy v. Togher*, 382 Ill. App. 3d 1, 8 (2008) (cases cited therein); *Alqadhi v. Standard Parking, Inc.*, 405 Ill. App. 3d 14, 18 (2010). As previously discussed, determinations of fact will only be reversed if they are against the manifest weight of the evidence.

¶ 121     Considering the evidence presented, we conclude the plate glass window was not an open and obvious danger. The open and obvious doctrine applies only where *both* the condition and the risk are apparent to and would be recognized by a reasonable person. *Belluomini v. Stratford Green Condominium Ass'n*, 346 Ill. App. 3d 687, 694 (2004). While Lynch testified that she was able to view the cracks in the glass from the parking lot (thus making the condition of the window apparent to a reasonable person), the evidence also established that the risk of the plate glass window breaking due to the application of a slight force would not be recognized by a reasonable person. In sum, we reiterate that the trial court was in the best position to consider the evidence and weigh the credibility of those who testified, including the expert testimony. See *Dale*, 158 Ill. App. 3d at 409; *Peet*, 41 Ill. App. 2d at 369. It is not our function to retry or reweigh the evidence presented in the case. Accordingly, we affirm the trial court's determination that Belfor had a duty towards the decedent as a possessor of land.

¶ 122                                    3. Scope of Contract

¶ 123     Belfor's final argument is that it owed no duty to the decedent because the contract between it and Karnezis did not impose on it a responsibility for the boutique's store front windows. Typically, "[w]here a defendant is charged with negligence because of his failure to perform an act allegedly required by contract, the question of whether the defendant actually had a duty to act will be determined by the terms of the contract." *Gilley v. Kiddel*, 372 Ill. App. 3d 271, 275 (2007). " '[T]he defendant's duty will not be extended beyond the duties described in the contract.' " *Id.* (quoting *Perkaus v. Chicago Catholic High School Athletic League*, 140 Ill. App. 3d 127, 134 (1986)).

¶ 124     Belfor asserts the cases of *Kotarba v. Jamrozik*, 283 Ill. App. 3d 595 (1996), and *Thompson v. Gordon*, 241 Ill. 2d 428 (2011), are factually on point with regard to whether a duty is owed under the contract in this instance. We disagree. In contrast to *Kotarba* and *Thompson*, this matter proceeded to trial and was decided on a premises liability theory. In *Kotarba*, a slip and fall case, the defendant (a handyman who varnished the staircase on which the plaintiff fell) did not exercise control over the building and plaintiff charged him with negligence based on his failure to perform an act allegedly required by the contract. *Kotarba*, 283 Ill. App. 3d at

597. Similarly, the plaintiff's complaint in *Thompson* was not based on a premises liability theory and, instead, alleged that the defendants were negligent for failing to provide proper road barrier analysis and design when it designed two ramps west of I-94 and that such a failure caused the plaintiff's injuries. *Thompson*, 241 Ill. 2d at 432-33. The defendant then argued in a motion for summary judgment that it had no duty towards the plaintiff where its contract for the roadwork did not require barrier analysis or design and its work did not encompass the area of the accident. *Id.* at 434. Our supreme court agreed. *Id.* at 450. Since we have concluded that the trial court correctly determined that Belfor had a duty as a possessor of the property pursuant to the Restatement, we need not consider this argument. This is particularly true where plaintiff proceeded to trial against Belfor on a premises liability theory and not on a theory based on Belfor's failure to perform an act required by the contract. See *Hanna*, 2016 IL App (1st) 143727, ¶ 24; see also *Madden*, 395 Ill. App. 3d at 375 (in a premises liability case, declining to consider whether defendants' duties were limited by the scope of their contracts where they were not possessors within the meaning of the Restatement).

¶ 125                    B. Propriety of the Damages Award

¶ 126        Belfor next argues that the trial court improperly awarded plaintiff damages on both the survival and wrongful death counts. Specifically regarding the survival count, Belfor contends that (1) the evidence of pain and suffering was too speculative to sustain an award, (2) the million dollar award falls outside the range of reasonable compensation and shocks the judicial conscious, and (3) the trial court ignored evidence that would negate or mitigate pain and suffering. As to the wrongful death award, Belfor asserts that the evidence adduced at trial rebutted the presumption that the decedent's lineal next of kin sustain substantial pecuniary loss by reason of a death. Based on these arguments, Belfor maintains that the awards should be remitted to $100,000 for each count.

¶ 127        An award of damages will not be overturned unless it is against the manifest weight of the evidence. *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 13; *Drakeford v. University of Chicago Hospitals*, 2013 IL App (1st) 111366, ¶ 55. A judgment is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings are unreasonable, arbitrary, and not based upon any of the evidence. *1472 N. Milwaukee, Ltd.*, 2013 IL App (1st) 121191, ¶ 13; *Drakeford*, 2013 IL App (1st) 111366, ¶ 55. A reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the trier of fact. For the reasons that follow, we affirm the trial court's damage award and find that it is not contrary to the manifest weight of the evidence.

¶ 128                         1. The Survival Count

¶ 129        Belfor raises numerous arguments in support of a remittitur in regard to the survival count. First, Belfor contends that the evidence was insufficient because the only evidence presented that the decedent was conscious was that he was groaning at the scene of the accident for a few minutes and any other evidence offered by plaintiff that he was conscious, such as Dr. Schwab's testimony, was mere speculation. Second, Belfor asserts that the trial court's award was a result of passion, as evidenced by the language utilized in the trial court's order ("[i]t was a gruesome and unnecessary death") as well as the trial court's disregard for the testimony

presented by the defense. Third, Belfor maintains that the $1 million award was excessive and shocks the conscious where the decedent died quickly and the trial court ignored the evidence that the decedent had a high blood alcohol level and Norco in his system, which would have negated or mitigated his pain and suffering.

¶ 130     We first address Belfor's contention that the evidence was insufficient to find the decedent experienced *conscious* pain and suffering. Belfor maintains that there is no Illinois case law that supports the trial court's conclusion. In support of this contention, Belfor points to numerous cases outside of Illinois in which those courts found that groaning is too speculative to support a finding of consciousness. See *Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1149 (5th Cir. 1981); *Carlisle v. Duncan*, 461 S.W.2d 254, 256 (Tex. App. 1970); *D'Antuono v. United States*, No. 4:07-CV-123-Y, 2010 WL 2465493 (N.D. Tex. June 15, 2010); *Carr v. Arthur D. Little, Inc.*, 204 N.E.2d 466, 469 (Mass. 1965); *Or v. Edwards*, 2001 WL 35937280 (Mass. Super. Ct. May 23, 2001). We note that Belfor primarily relies on cases from Texas that, in turn, rely on Massachusetts state law for this proposition. Of those cases, two were appeals of judgments not withstanding the verdict or directed verdicts on the issue of conscious pain and suffering. See *Carr*, 204 N.E.2d 466; *Or*, 2001 WL 35937280. The defendant here does not challenge the trial court's ruling on a judgment *n.o.v.* or a directed verdict, and thus the Massachusetts cases are distinguishable. In the remaining cases Belfor relies on, the plaintiffs' claims went to a verdict. *Ballou*, 656 F.2d at 1150; *Carlisle*, 461 S.W.2d at 255; *D'Antuono*, 2010 WL 2465493. Of those cases, none have similar fact patterns or evidence analogous to the case at bar. Accordingly, we find Belfor's reliance on them to be misplaced. Most importantly, however, we observe that, "[o]nly in the absence of Illinois authority on the point of law in question are we to look to other jurisdictions for persuasive authority." (Internal quotation marks omitted.) *Stonegate Insurance Co. v. Hongsermeier*, 2017 IL App (1st) 151835, ¶ 35 (quoting *Allstate Insurance Co. v. Lane*, 345 Ill. App. 3d 547, 552 (2003)). We disagree with Belfor's contention that there is no relevant case law in Illinois.

¶ 131     We find *Cooper v. Chicago Transit Authority*, 153 Ill. App. 3d 511 (1987), to be particularly relevant and instructive to the issue at bar. The reviewing court in *Cooper* found the trial court did not err in allowing the trier of fact to determine whether or not the decedent experienced conscious pain and suffering where the first person who responded to the accident testified that the decedent was moaning. *Id.* at 523. Importantly, this witness further testified that he did not know if the decedent was conscious at that time. *Id.* at 516. The court held, "[i]n the face of that testimony, which could indicate to the jury that decedent consciously experienced pain, the trial court did not err." *Id.* at 523.

¶ 132     Similarly, the evidence at trial established that the sole eyewitness in this case observed the decedent riding his bicycle in the moments before the accident and that the decedent did not appear to be intoxicated. Rodriguez's testimony further indicated that, while the bicycle wobbled, the decedent was in control of the bicycle at the time he placed his hand on the plate glass window. Once Rodriguez approached the scene of the accident, he testified he heard the decedent moaning for two or three minutes. Rodriguez demonstrated the sound to the court. The trial court judge indicated that the sound was "something on the order of oh, o-h, with a number of H's behind it." Rodriguez was unable to see whether or not the decedent's eyes were open because the decedent was wearing sunglasses. He also did not observe the decedent make any movements.

¶ 133    In addition, the trial court heard the uncontroverted testimony of plaintiff's witness, Dr. Schwab, who opined that the decedent would have experienced conscious pain and suffering at the time he fell through the window based on the severity of his injuries and the eyewitness testimony. Dr. Bauer also opined that the decedent consciously experienced pain for some unknown period of time from the point when he was first cut by the glass, while he was moaning in Rodriguez's presence, and prior to the Oak Lawn fire department's arrival.

¶ 134    We again observe that the trial court is in a superior position to observe the demeanor of the witnesses while testifying, to judge their credibility, and to determine the weight of their testimony along with the other evidence court received. *In re Estate of Bennoon*, 2014 IL App (1st) 122224, ¶ 72. "For that reason, we may not substitute our judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Tully v. McLean*, 409 Ill. App. 3d 659, 670-71 (2011). Based on this evidence and the deference we must provide to the trier of fact, we conclude the evidence was sufficient to support the damages for pain and suffering awarded in this case.

¶ 135    We further acknowledge that Belfor asserts the trial court disregarded the testimony of Loughey, who arrived on the scene within two minutes of being dispatched and never observed the decedent conscious.

¶ 136    We are not persuaded by Belfor's contention. Lay testimony describing the decedent's actions prior to death is sufficient for evidence of pain and suffering. *Moore v. Swoboda*, 213 Ill. App. 3d 217 (1991). In *Moore*, one witness testified that when she arrived at the accident scene, the decedent was conscious. *Id.* at 235. The witness stated that the decedent nodded his head as she held and reassured him. *Id.* Another witness testified the decedent had a pulse when he arrived at the accident scene. *Id.* This evidence, together with the evidence concerning the decedent's injuries, was sufficient to support a conclusion that the decedent experienced conscious pain and suffering. *Id.* Notably, in coming to this conclusion, the *Moore* court observed that there are no Illinois cases requiring medical testimony establishing consciousness prior to death as a prerequisite to obtaining damages in a survival cause of action. *Id.* at 234. Rather, courts have routinely relied on lay testimony describing the decedent's actions prior to death in order to determine whether there is sufficient evidence to support a damage award. *Id.*

¶ 137    Moreover, evidence as to a physical manifestation of pain and suffering is not necessary to uphold damages for conscious pain and suffering. In *Hall v. National Freight, Inc.*, 264 Ill. App. 3d 412 (1994), the defendants claimed on appeal that the jury erred in its award to plaintiff because the evidence demonstrated that when the accident scene witness observed the decedent, he did not appear to be in pain, but was "in a mellow state beyond the point of pain." *Id.* at 427. The defendants also noted that the decedent " 'wasn't complaining of a great deal of pain or anything.' " *Id.* On review, the *Hall* court noted that a jury can consider evidence regarding a decedent's injuries when determining whether the decedent experienced conscious pain and suffering so as to permit recovery under the Survival Act. *Id.* The court further observed that medical testimony is not required to establish conscious pain and suffering "where lay testimony describing a decedent's actions prior to death coupled with evidence concerning his injuries is sufficient to support a recovery." *Id.* In this case, the lay witness testimony, as previously discussed, established the decedent was conscious prior to death and the medical testimony was dispositive that the decedent suffered a severe, almost complete

amputation of his leg. Accordingly, this evidence was sufficient to sustain a damages award for conscious pain and suffering. See *id.* at 427-28.

¶ 138    Lastly, we observe that while the evidence established that the decedent experienced conscious pain and suffering for only a few minutes, the duration of one's pain and suffering affects the amount of damages to be awarded, not the ability to recover those damages. See *Glover v. City of Chicago*, 106 Ill. App. 3d 1066, 1072 (1982). This concept has also been accepted and applied by federal courts in our jurisdiction. While it is well settled that federal decisions are not binding on Illinois state courts (*Ardon Electric Co. v. Winterset Construction, Inc.*, 354 Ill. App. 3d 28, 38 (2004)), federal decisions can be considered to be persuasive authority, and they may be followed if we believe the federal analysis to be reasonable and logical (*Werderman v. Liberty Ventures, LLC*, 368 Ill. App. 3d 78, 84 (2006)). Notably, in *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 507 F. Supp. 21 (N.D. Ill. 1980), the court held that a short time interval of conscious pain and suffering is not a bar to a claim for damages. *Id.* at 24. For these reasons, we conclude the evidence was sufficient to support the damages for pain and suffering awarded in this case.

¶ 139    Belfor next argues that the trial court's award was a result of passion as evidenced by the language utilized in the trial court's order, "[i]t was a gruesome and unnecessary death." Belfor further asserts that the trial court disregarded the defense testimony and at the same time disregarded impeaching or improper testimony from plaintiff's witnesses.

¶ 140    We disagree with Belfor's assessment of the language used in the written order and further agree with the trial court that the injury, which almost completely severed the decedent's leg, was gruesome and unnecessary. We also disagree with Belfor's statement that the trial court disregarded the testimony. The trial court memorialized its judgment in a careful and considered 56-page written order. Comparing the record to the trial court's written findings, we cannot say that the trial court's determination was the result of passion as Belfor suggests. See *Drews v. Gobel Freight Lines, Inc.*, 197 Ill. App. 3d 1049, 1061 (1990).

¶ 141    Lastly, Belfor maintains that the $1 million award was excessive and shocks the conscious where the decedent died quickly and the trial court ignored the evidence that the decedent had a high blood alcohol level and Norco in his system that would have negated or mitigated his pain and suffering. Our review of the record reveals that the trial court was acutely aware of the time the decedent was conscious, the time the decedent expired, and the toxicology testimony. Moreover, Belfor fails to provide a citation to any legal authority where a damage award for pain and suffering was found to be against the manifest weight of the evidence in circumstances similar to this case. See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016). Accordingly, we cannot say the trial court's award of damages bears no relationship to the loss suffered or was a result of passion or prejudice. See *Drews*, 197 Ill. App. 3d at 1061.

¶ 142                                          2. Wrongful Death Award

¶ 143    Belfor next contends that he is entitled to a remittitur of the wrongful death award of $100,000 because the presumption that the decedent's children sustained a substantial pecuniary loss was not supported by the evidence. Belfor maintains that the award was based merely on subjective testimony and that no physical evidence such as phone records were admitted into evidence to corroborate the interested witnesses' testimony. Further, Belfor asserts that the evidence established the Racky children had been estranged from the decedent for many years.

¶ 144    Plaintiff in this case is seeking to recover damages pursuant to the Wrongful Death Act, which provides that the jury in a wrongful death suit may award damages to compensate the surviving spouse and next of kin for the "pecuniary injuries" resulting from the individual's death. 740 ILCS 180/2 (West 2012). These injuries include damages for grief, sorrow, and mental suffering to the surviving spouse and next of kin of such deceased person. *Id.* Such damages are premised upon a rebuttable presumption that the surviving spouse and next of kin would have had a reasonable expectation of benefits from the continuation of the life of the deceased. *Chrysler v. Darnall*, 238 Ill. App. 3d 673, 679 (1992). That presumption, however, is rebuttable, and the trier of fact may disregard that presumption if it determines that the facts do not support it. *Id.* For instance, the presumption may be rebutted by evidence that the next of kin were estranged from the deceased, because, in such a case, there would be no benefits derived from the continuation of his life. *Bullard v. Barnes*, 102 Ill. 2d 505, 517 (1984).

¶ 145    Thus, the issue in the instant wrongful death suit is whether, under the facts of this case, the Racky children have suffered pecuniary injuries resulting from the death of their father. The evidence here established that, prior to his death, the decedent had reconciled with his adult sons. Dr. Kulick testified that recent history was the best guide to determine the relationship the decedent would have maintained with his children had he not died. The testimony established that the sons met and spent time with their father twice, once in November 2010 and again in March 2011. The testimony further established that he spoke on the phone with his sons on numerous occasions. Dr. Kulick's testimony, along with that of Matthew and Sean, establish that damages for pecuniary injury were warranted with regards to them.

¶ 146    As for Meghan and Molly, we agree with Belfor that the evidence demonstrated that they did not have a relationship with their father at the time of his death, and this was discussed at length in the trial court's memorandum opinion. Whether or not the Racky daughters had a relationship with their father, however, is not dispositive of whether they suffered a pecuniary injury. The wrongful death statute expressly provides that pecuniary damages include damages for "grief, sorrow, and mental suffering." 740 ILCS 180/2 (West 2012). The evidence at trial established that both Meghan and Molly experienced mental suffering as a result of their father's death. Meghan's testimony was corroborated by Harthun's testimony regarding complicated grief and her diagnosis that Meghan suffered from complicated grief. Moreover, Dr. Kulik also opined that all the Racky children suffered grief and sorrow based on the decedent's alcoholism and concurred that the children exhibited symptoms of complicated grief. Accordingly, we conclude that the trial court's award of damages for wrongful death was not against the manifest weight of the evidence. See *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746, ¶ 124.

¶ 147                                           CONCLUSION
¶ 148    For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

¶ 149    Affirmed.